[Civ. No. 2893. Fourth Dist. Aug. 3, 1943.]

Estate of CARL WITHINGTON, Deceased. CALLIE BELLE SWEITZER, as Administratrix, etc., et al., Appellants, v. LYSLE WOODWARD WITHINGTON et al., Respondents.

Frank Pomeranz, Charles C. Crouch and Richard F. Kahle for Appellants.

Frank A. Gazlay, Mathes & Sheppard, Wm. C. Mathes, Charles Fox, Jr., and Gordon F. Hampton for Respondents.

BARNARD, P. J.—Carl Withington died on October 23, 1925, while a resident of San Diego County. By his will he left nothing to his widow other than her community interest

in his property and, after a few relatively small bequests, he left the residue of his estate in equal shares to his three sisters Harriet W. LeMay, Norma Withington, Callie Belle Sweitzer, and his brother Lysle Woodward Withington. His estate was finally appraised at $715,713.39. About 80% thereof was in personal property, consisting of cashier's checks, Liberty bonds and certain gambling interests and other property situated in Mexico. His estate also included undivided interests in real estate in Kern County which were valued at some $50,000. Prior to and shortly after his appointment as executor Lysle Withington sold the gambling interests in Mexico and succeeded in bringing into this state most of the property in Mexico which had been owned by the decedent.

The will was admitted to probate on November 13, 1925, and Lysle Withington was appointed executor. Although the will exempted him from giving bond, upon the request of the widow the court ordered a bond in the sum of $250,-000 and such a bond was furnished by the American Surety Company, the intervener here. On March 6, 1926, the will was also admitted to probate in Baja California, Mexico. Lysle Withington was appointed executor there and proceedings for the administration of the estate in Mexico have since been and still are pending.

Upon her petition the widow was granted a family allowance of $1000 a month. Thereafter, she filed a contest to the probate of the will, which was finally determined adversely to her in 1929. (Estate of Withington, 99 Cal.App. 617 [279 P. 196, 280 P. 152].) Negotiations between the widow and the brother and sisters for a settlement of the widow's community interest in the estate then followed, which resulted in an agreement by which the widow agreed to accept $225,000 in full settlement of all of her claims and that amount was ordered distributed to her and was paid to her in 1931. In July, 1933, the executor filed a petition asking that the bond theretofore issued be discharged. The three sisters of the executor signed and filed a request that this be done. On August 5, 1933, an order was entered discharging the bond. Theretofore, all claims of creditors and all specific legacies had been paid and partial distributions had been made to the residuary legatees. Thereafter, as disclosed by the record, the executor and his sisters proceeded to divide up the dece-

dent's jewelry and, apparently, to deal with the money and property of the estate largely by mutual agreement. The sisters, as they had done before, took and used the income from the estate's portion of the Kern County real property and at times received other funds from the estate. The executor, on the other hand, seems to have drawn at will from the funds of the estate for his personal needs.

On August 25, 1939, on the request of Norma Withington, an order was entered requiring the executor to file an account. On December 16, 1939, an agreement was filed in the estate proceedings which was signed by the executor and all three of his sisters. This agreement provided that Lysle Withington thereby resigned as executor; that the citation of August 25, 1939, requiring him to render an account "is hereby dismissed with prejudice, and the clerk is hereby directed to enter a dismissal thereof"; that the three sisters and each of them waived any and all right to have the executor file or make an account of any kind; that each of them had had knowledge of and had acquiesced in all of his official acts as executor from the date of his appointment; that each of them released him "from any and all claims from any administration of said estate"; that he in turn waived any right to require any of his sisters to account to the estate or to him for anything they had done or failed to do in connection with the property or income of the estate; that each released the others from any claim for anything theretofore done in connection with this estate, whether as executor or otherwise; that each acknowledged that from time to time, by consent of all, partial distributions of the estate have been made; that a petition "for ratable distribution of certain real property" which had been filed should be granted by the court; and that Norma Withington, with the approval of the court, should be appointed as administratrix to complete the administration of the estate. On December 16, 1939, an order was entered appointing Norma Withington as administratrix with the will annexed. A petition for a ratable distribution was thereafter granted.

In the summer of 1940, it was discovered that the state inheritance taxes had been only partly paid. The sisters were then urged to give notice of rescission of the agreement of December 11, 1939, and to proceed to compel the executor to file an account. They refused to do this but, after strong pressure,

finally reluctantly yielded. On July 3, 1940, they filed a notice of rescission of the agreement and on July 10, 1940, a citation was issued ordering the executor to file an account and suspending his powers as executor. Thereafter, he was fully removed as executor, Norma Withington acted as administratrix for a time, after which Callie Belle Sweitzer was appointed administratrix and later removed, and then another administrator was appointed.

When the agreement of December 11, 1939, was filed and the order appointing Norma Withington as administratrix was entered, the executor turned over to her all papers and files in the estate which were in his possession and those which he was able to obtain from the office of his attorney, who was then dead. After the citation to account was issued the executor filed his account in two sections, and a lengthy hearing was had. Thereafter, upon direction of the court, he filed an amended report and account in order to conform to the proof. The three sisters filed objections to the account, many of which were sustained by the court. In its findings and decree the court charged the executor with approximately $90,000 over and above the property of the estate which he had turned over to his successor. Harriet LeMay and Norma Withington having died in the meantime, Callie Belle Sweitzer appealed from the decree settling the final account of the executor for herself and also as administratrix of the estate of Carl Withington, as the administratrix of the estate of Harriet LeMay, and as executrix of the estate of Norma Withington. Upon her removal as administratrix of the estate of Carl Withington, the new administrator of that estate was substituted on this appeal. The record consists of 15 volumes, besides innumerable exhibits.

Lysle Withington also took an appeal from the decree settling his final account but that appeal has been dismissed. For convenience, we will refer to him both as the executor and as the respondent. It may first be observed that in its decree the court specifically made its findings only as to an accounting between the executor and the administratrix with the will annexed, and reserved consideration of the rights of all other parties arising from the contract of December 11, 1939, which waived an accounting, for adjudication on a later petition for distribution. Why the court did not directly pass upon the effect of the contract of December 11,

1939, and the attempted rescission thereof, does not appear. We are pointed to no evidence which would have supported a finding of rescission of that contract and portions of the evidence indicate not only that restoration was not made but that the sisters were unable to restore what they received under that agreement.

The first point raised by the appellants is that the respondent executor was short $65,120.47 in accounting for the cash received by him and that the court erred in not allowing this item as a charge against him. On September 20, 1926, the executor filed his inventory and appraisement, the first item of which was ''money belonging to the said deceased which has come to the hands of the executor, $344,-453.05.'' In his account he charged himself with $279,332.58 as received in cash, and the difference is the amount here in question.

The undisputed evidence is that shortly before his death Carl Withington divided all of his actual cash between his brother and his three sisters; that he left certain cashier's checks, bank drafts and bank accounts, all of which were deposited by the executor in the estate account; and that prior to the time the inventory was filed the executor sold certain gambling interests and other property left by the deceased and deposited the proceeds in the estate account. There is a clear inference from the evidence that this item of the inventory included not only the cashier's checks and bank drafts, which might be considered as money, but also money received from the sale of property after the death of the decedent and before the inventory was filed. Under this view all of this item was accounted for. This view is supported by considerable testimony, including that of two public accountants. One of them testified that the addition of the totals of the cashier's checks, bank drafts and similar items and the amounts deposited in the estate account up to the time the inventory was filed would give the amount thus listed in the inventory within $1.66. He gave a logical explanation for this difference in that the attorney, in preparing the inventory, could easily have omitted two items of 83c each which were a part of larger figures. The evidence sustains the court's findings in this regard and no evidence to the contrary was offered by the appellants.

It is now argued, however, that the amount set forth

in this item of the inventory was accepted as true and acted upon in a number of subsequent proceedings in the estate without being questioned by the executor, and that it is now too late, under the doctrine of laches, for him to correct any error if such there was. The cases cited in support of this contention have no application here. This is not a case of an executor charging himself with certain property belonging to an estate and many years later attempting to claim that the property belonged to himself rather than to the estate. Here, the property was merely reported in its converted form and the court was justified in finding that it was fully accounted for.

In their reply brief the appellants state that the executor filed a first account on October 4, 1928, in which he charged himself with this same item and that this account was approved by a minute order dated January 4, 1929. It is then argued, for the first time, that this order approving the first account has become final and precludes him from disputing "the correctness of the amount of cash with which he charged himself in his original inventory." Cases are cited to the effect that items once settled in a previous account are conclusive and may not be reexamined upon the settlement of a final account. Assuming, but not holding, that this minute order was sufficient to settle the first account, we see nothing in this rule which would prevent this respondent from showing the source from which he derived the amount with which he charged himself and which was thus approved. There is nothing in this rule which would require the respondent to be charged twice for the same amount received, and the evidence supports the court's refusal so to do.

Taking them out of order the appellants, in six other points, contend that various other amounts received by the executor were not inventoried by him or accounted for, and that the court erred in not charging him therewith. These items were $2,500 received from the sale of an automobile, $1,498.12 received from the sale of a gambling interest, $35,000 received from the sale of an interest in the Foreign Club, $20,047.24 received from the sale of a gambling interest known as the "Atkin Book," $510 received from the "Holland note," and $165.94 received as interest on a certificate of deposit. The evidence is that these amounts were all deposited in the estate account and that they were included in the first item of the inventory, to which we have just referred.

In their reply brief the appellants concede this and concede that our holding, with respect to these six items, should follow our holding with respect to the first point above discussed relating to the alleged shortage of about $65,000 in the amount of cash inventoried. In view of this concession nothing further need be said with respect to these six points. It is also contended that the court erred in failing to allow interest on three other amounts charged to the executor. As pointed out by the respondent, interest on these amounts was allowed by the court.

It is next urged that the court erred in failing to charge the executor with the loss of $25,207.88 from a deposit in a bank in Mexicali, Mexico. About $39,000 was on deposit in that bank in the deceased's account at the time of his death and was listed in the inventory filed on September 20, 1926. However, it was never brought to California and the evidence supports the finding that it never came into the possession of Lysle Withington, as executor of the California estate. There is evidence that he was advised by Mexican attorneys that this deposit could not be legally transferred to California and that the bank refused to permit this to be done. With the knowledge and consent of the sisters, probate proceedings were also started in Mexico and he was appointed executor there. On April 7, 1931, he, as executor of the Mexican estate, removed $25,207.88 from this account and redeposited it in a bank in Tiajuana, Mexico. He then authorized his Mexican attorneys to withdraw moneys from this account and the evidence indicates that they withdrew it all for their personal use.

The court found that this executor had been appointed executor of the estate of Carl Withington in the Republic of Mexico; that he is still so acting and, as such, is accountable to the courts of that country for all the Mexican assets of said estate; that under the law of Mexico in force at the death of the decedent a deposit in a Mexican bank is a portion of the Mexican estate for which the Mexican executor is accountable there; that this bank account was listed in the inventory there as a part of the Mexican estate; that under the applicable law of Mexico the probate proceedings in that country are in no sense ancillary to but are entirely independent of the probate proceedings in California; that under that law the Mexican executor is held accountable to the Mexican courts for any deposit in a Mexican bank; that

under that law, upon the closing of the estate in Mexico, the Mexican executor will be required to account to the Mexican courts and to distribute all remaining property direct to the beneficiaries of the Mexican estate; and that under the Mexican law this executor is accountable to the courts of Mexico for the amount of this bank deposit and is not accountable therefor in this proceeding.

The appellants rely upon *In re Ortiz,* 86 Cal. 306 [24 P. 1034, 21 Am.St.Rep. 44] ; *Estate of Grivel,* 199 Cal. 351 [249 P. 184] ; *Estate of Grivel,* 128 Cal.App. 186 [17 P.2d 172], and *Estate of Barreiro,* 125 Cal.App. 752 [14 P.2d 786]. While some of the language used in those cases is favorable to the appellants' contentions here that language is largely based upon the relation between domicillary administration and ancillary administration as the same exists as between various states in this country. Moreover, each case must depend upon its own particuar facts. In the instant case, the evidence supports the court's findings as to the nature and effect of the pertinent laws of Mexico and it fully appears that no part of this bank account ever came into the hands of the California executor, that it did come into the hands of Withington as a Mexican executor, and that he must account therefor to the courts of that country. While it may be conceded that a California executor must be charged with everything which came into his hands as such executor, and further that he may be charged with property which he should have taken into possession as such executor or which, in due course, should be distributed to the California estate, it is quite another matter to hold that he must ignore the courts of another jurisdiction or to charge him with property which has not, and which cannot, come into his possession as California executor. As was said in *Estate of May,* 112 Cal.App. 673 [297 P. 955], "Under the circumstances it would have been futile to make an order that would not be binding in Mexican jurisdiction." The matter was a question of fact for the trial court and the evidence, while conflicting, supports the finding made.

It is next contended that the court erred in not charging the executor with $72,605.33 as the loss on a so-called "stockholders' loan" to the Aztec Brewing Company. In the original inventory, filed in 1926, this loan was valued at the amount above stated. In 1941, these appellants petitioned for reappraisement of properties belonging to the estate, al-

leging that, through error, various properties had been excessively valued. Their petition was granted and a reappraisement was made and filed by a state inheritance tax appraiser in which he appraised this item as being of no value at the time the testator died.

From the evidence it appears that the Aztec Brewing Company, a Mexican corporation, was formed about 1923, Carl Withington having one-half of the stock for which he paid $25,000. Other stockholders contributed a like amount. They found they needed more money and Withington loaned the company the amount in question and the other stockholders loaned a similar amount. These were called stockholders' loans and there is evidence that it was understood and agreed that the loans were to be repaid when and if the enterprise made sufficient profit to make this possible. Business was bad for some years and in 1927, some two years after the death of Withington, the brewery was entirely destroyed by fire. It was rebuilt with money borrowed by the other incorporators, the Withington estate not participating. There is no evidence that it made any money and by 1932 the Mexican corporation owed large sums of money, including a very large claim of the Mexican Government. At that time another Aztec Brewing Company was incorporated in California, which established a brewery here and which is still operating. Some of the assets of the Mexican corporation were turned over to the California corporation and brought to this state. One half of the stock of the California corporation was issued to a trustee and is being held by that trustee for the benefit of the Carl Withington estate, but there is evidence that it cannot be turned over to the estate until matters in connection with the claim of the Mexican Government, various debts and the contributions of the other stockholders after the fire are settled and adjusted. The president of the California corporation testified that this estate has some interest in that corporation but that he did not know the extent or amount of this interest.

It is argued that the executor could have collected a part of this debt since a considerable amount of the assets of the Mexican corporation were turned over to the California corporation, and that the court should have charged the executor with the total loss of this debt because the estate's interest in the Aztec Brewing Company was reappraised at $35,000, and it follows that the corporation must have had assets of at

least $70,000 in excess of all of its liabilities, including these stockholders' loans. There is ample evidence that this stockholders' loan was valueless at the time the testator died. The evidence would justify the inference that it has not increased in value since that time and that while the estate still has an interest in the reorganized company that interest probably does not exceed the original investment in stock in the Mexican company. The fact that the persons who formed the California corporation still recognize that the estate has some interest therein does not prove that the original Mexican corporation had assets sufficient to pay all of its debts, including these stockholders' loans. While a confused situation exists, whatever interest the estate had in the Aztec Brewing Company still exists and has been turned over by this executor to the new administrator of the estate, and the benefit of that interest, whatever it is, will accrue to the estate. Whatever else may be said about this stockholders' loan it cannot be held that the trial court was compelled to find that the value thereof was lost through any act of this executor. The evidence was insufficient to establish any loss occurring through his fault. Whatever the present situation, any possible asset still remains, and it neither appears that this debt could have been collected at any time nor that the obligation is now worth less than it was when the decedent died.

It is next urged that the court should have charged the executor with the amount of two notes which it is said he permitted to outlaw. One of these notes was secured by a trust deed on real property in Kern County which, of course, has never outlawed. The trustor's interest in this property was purchased by one of the sisters, Mrs. LeMay. She later sold the property and kept the money, but she testified it was by mutual agreement. The other note was secured by a mortgage on certain lots in San Diego. The note was never worth more than the security. Mrs. LeMay also purchased the mortgagor's interest in these lots and testified that she was holding this as "family property." The evidence, although conflicting, supports the court's action in this regard.

It is next contended that the executor should have been charged with a $5,000 loss on account of an unauthorized loan to one Rodney Clarke. It appears that in his lifetime the deceased had loaned Clarke $10,500 on notes secured by 500 head of cattle. The executor subsequently loaned Clarke $5,000 in an attempt to save his cattle business, to

the end that the entire debt could be collected. While the attempt was unsuccessful the $5,000 was loaned in Mexico from funds in the Mexican bank, which advanced the funds and kept the papers. Aside from any other considerations, this item is one for which this executor is accountable to the Mexican courts as a part of the estate being administered in that country.

It is next contended that a certain $800 was withdrawn from the estate funds by the executor and should have been charged to him. This grew out of a transaction between the executor and his sister Mrs. LeMay concerning rentals from Kern County property in which the executor had a personal interest. Again, the evidence is conflicting but portions thereof support the implied finding that this money belonged to the executor personally.

It is next argued that the executor should have been charged with the entire amount of rentals collected by him from "the Associated oil property," a portion of the property in Kern County in which the executor, his three sisters and the estate were all interested. For many years, Mrs. Le-May had collected these rentals, none of which were paid into this estate. For some sixteen months, beginning in December, 1937, this executor collected these rentals. It appears, without question, that the estate's share of the rentals thus collected by him have been correctly accounted for by him. It is contended, however, that he should have put into the estate funds the entire amounts collected, letting the estate distribute to the various owners their respective portions. Since the interest of the estate is in no way affected we see no reason for disturbing the court's finding and conclusion in this matter.

It is next urged that the court improperly allowed the executor credit for $5,000 paid to an attorney who filed a claim for legal services performed for the decedent during the last three or four months of his lifetime. This claim was filed within the time for presenting claims, was approved by the executor and by the court, and was paid. It was again approved by the court in the settlement of this account. It is argued that the only service was drawing the decedent's will and that the evidence on this hearing was too "meager." There is some evidence of other services included in the claim and nothing more than a conflict in the evidence appears.

It is next urged that a payment of $5,000 on account

of executor's fees and two payments of $5,000 and $850 for attorney's fees were unauthorized, and that the court erred in refusing to charge these amounts to the executor. The two $5,000 items were paid pursuant to an order of the court dated February 18, 1927. The $850 item was for certain special services in connection with a ten-year lease and was paid pursuant to an order of court dated July 9, 1937. The only argument with respect to these items in the opening brief is that the orders of court authorizing their payment were invalid under former section 1616 Code of Civil Procedure because no notice was given of the applications for such allowance. In their reply brief the appellants further argue, with respect to the two $5,000 items, that at the time these allowances were made a relatively small part of the work had been performed. No facts are set forth but we are invited to examine the voluminous record in the hope of discovering an abuse of discretion. Assuming that the original orders were irregular it appears that the matters were again thoroughly presented to the court on the hearing of this account, and since there is no clear showing of an abuse of discretion on the part of the court his conclusions on these matters may not be disturbed on this appeal. (*Estate of Hardenberg*, 18 Cal.App.2d 307 [63 P.2d 1200].)

It is next contended that the payment of $225,000 to the widow as her alleged share of the community property was unauthorized and illegal, and that the court should have charged the executor with that amount.

After the termination of the will contest in 1929 negotiations for settlement of the widow's community interest in the estate were conducted which resulted, in the spring of 1931, in an agreement under which the widow was to be paid and was to accept $225,000 in full settlement of all her claims. The evidence justifies the inference that all three sisters consented and agreed to this although Mrs. LeMay testified that she did not know of the arrangement until after the amount was paid. The agreement was made subject to the approval of the court. On March 30, 1931, the executor filed a "Petition For Partial Distribution" in which it was alleged that the estate was but little indebted and that the amounts in question could be distributed without loss to the creditors of the estate. It was prayed that the executor should be authorized and directed to distribute to the widow $225,000, being the amount of her share of the community property and that he be further authorized and directed to distribute the sum

of $10,000 each to himself and to his three sisters. On April 10, 1931, the court entered a decree of partial distribution directing that $10,000 each be paid to the executor and his three sisters, and also finding that the widow was entitled to one half of the community property; that the sum of $225,000 is not greater than her one half share of the community property and that she was entitled to not less than $225,000 upon the final distribution of the estate; that these respective amounts might be distributed as prayed for in the petition without injury to the estate and that it is for the best interest of the estate and all of the heirs that the said amounts be distributed as prayed for. It was then ordered that these respective amounts were thereby distributed to these persons, respectively, and that the executor "is hereby authorized and directed to pay out of the funds of the said estate the amounts above set forth." Pursuant to that order $225,000 was paid to the widow and $10,000 each to the executor and his three sisters. The widow signed a receipt in which she agreed to pay any inheritance tax if one should ever be assessed against her interest in the estate.

Thereafter, and on July 24, 1933, the executor filed a petition alleging that while the will provided that the executor should serve without bond one had been required on request of the widow; that since that time the widow had received her full amount of the estate and had receipted therefor; that it was a burden upon the estate to continue to pay the premium on the bond; and that the only persons entitled to participate in the further distribution of the estate were the executor and his three sisters. It was then prayed that the bond theretofore issued be discharged. With that petition was filed a statement signed by the three sisters to the effect that they were the only persons interested in the estate with the exception of the executor, and requesting that an order be entered cancelling the bond as prayed for by the executor. On August 5, 1933, the court entered an order discharging the bond.

The decree of April 10, 1931, under which these payments were made, has not been set aside and was never appealed from or in any way attacked until this proceeding, more than ten years later. The appellants now contend that under the statutes then in force the court had no authority to enter any such decree, that the widow was not entitled to receive her community interest until the estate was finally closed, and that in any event the court had no jurisdiction to make the

order of· distribution because the inheritance taxes had not then been paid. · In making this attack the appellants have not offered to return the $30,000 which they received under this decree and no mention is made of the fact that the estate has benefited through the stopping of the family allowance to the widow, which ceased when the decree was entered.

The respondent, in view of the statutes then in force and a number of cases, including *Gladding* v. *Superior Court,* 7 Cal.2d 408 [60 P.2d 857], argues that the decree of April 10, 1931, is a valid adjudication which is binding and conclusive upon the appellants. It is unnecessary, however, to pass upon this contention. Assuming that this procedure was unauthorized by any statute then in force and that the decree entered was beyond the jurisdiction of the court we think these appellants are estopped from now insisting that the executor be charged with the amount thus paid to the widow. There are no interested parties except the executor and these appellants. It is stated in the respondent's brief that the inheritance taxes are now paid. This is not denied in the appellants' briefs, and that such is the fact appears in another appeal in this estate which is being considered herewith. There are no outside parties or interests which are affected. It rather clearly appears that these appellants consented to this compromise with the widow, to the entering of this decree, and to the making of the payment in question. If there can be any question that Mrs. LeMay did not fully approve of it in advance she admits that she had knowledge of it when she joined in asking that the bond be discharged, and she thereby ratified what had been done. Moreover, there is no showing that these appellants have been in any way injured by this payment. Even after reappraisement, the inheritance tax appraiser's report filed on February 19, 1942, shows $254,371.44 as the ''community exemption'' of the widow. We are pointed to no evidence that the widow thus received more than she would receive had the matter been handled in a more regular manner.

A further consideration in this connection is that these appellants in 1939, for a valuable consideration, entered into and signed an agreement in which they stated that they had had knowledge of and had acquiesced in all of the acts of this respondent as executor of this estate and that they released him from all claims which they might have arising from his said acts. This agreement has not been set aside

and, so far as here appears, it presents a further ratification of the payment in question. In spite of any irregularity, since no third parties are involved, it would appear to be unjust in the extreme to permit these appellants to upset that decree, to which they consented, and to compel the executor to pay that amount into the estate while they themselves keep the $30,000 which they received through the decree which they are now attacking.

It is next contended that the court should have charged the executor with six items totaling $9,750, representing advances made by the executor to Norma Withington and Mrs. LeMay on various occasions between 1934 and 1938. It is argued that these advances were made without decrees authorizing partial distribution and that such advances cannot be considered upon the hearing of an account but can only be allowed as a credit against the respective distributable shares upon final distribution. *Estate of Ross,* 179 Cal. 358 [182 P. 303], *Estate of Willey,* 140 Cal. 238 [73 P. 998] and *Estate of Bennett,* 13 Cal.2d 354 [90 P.2d 84, 126 A.L.R. 771], are cited. While it may be conceded that this is the general rule the situation is somewhat different here where it is not a mere matter of bookkeeping. The executor has been removed and if he is compelled to pay these amounts into the estate the assets of the estate would be increased that much and an ordinary final distribution would not protect his rights. On the other hand, these matters may easily be adjusted upon a final distribution. These payments were made to these appellants at their request and they still retain the advances of which they complain. Undoubtedly a creditor or a third party could object to the allowance of credit for such advances in an account where the matter could be better adjusted on final distribution, as indicated in the cases above cited. No rights of creditors or third parties are here involved, these appellants are in no way injured and, under the circumstances which here appear, they are estopped from contesting the allowance of these credits. As between these parties the respondent should not be charged with these amounts and compelled personally to pay them again to the estate. (*Estate of Kennedy,* 120 Cal. 458 [52 P. 820] ; *Estate of Guglielmi,* 138 Cal.App. 80 [31 P.2d 1078].)

It is next contended that the respondent should have been charged with $35,000 represented by a cashier's check for that amount which was delivered to him in 1925

by the deceased in his lifetime. It is argued that this check was given "in a cover-up transaction by the deceased to avoid payment of federal income taxes," and that in reality it was property belonging to the deceased at the time of his death. While an attempt was made to establish such a fact it is readily apparent that the appellants were unable to produce the requisite proof. Assuming that there was a conflict in the evidence in this regard, the evidence amply supports the court's conclusion that this amount belonged to the executor personally.

Beyond question, this estate was handled in an irregular manner over a period of many years. While much of the fault lies with the respondent his sisters participated therein to a not inconsiderable extent. They had knowledge of and acquiesced in many of the things of which they or their representatives now complain. By common consent the estate was treated too much as a family affair and this seems to have been largely responsible for the confused situation which resulted. As finally presented to the trial court, things had been done which could not be undone and the court was faced with a difficult factual situation and with many practical problems. In our opinion, it did as well as could have been done under the existing circumstances and we find neither reversible error nor an abuse of that discretion which must rest in, and which here is peculiarly appropriate to, that court.

The decree appealed from is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied August 24, 1943, and appellants' petition for a hearing by the Supreme Court was denied September 30, 1943.