[Civ. No. 3476.   Fourth Dist.   Nov. 6, 1947.]

THOR H. NEILSEN, Appellant, v. LAWRENCE HOLMES et al., Respondents.

Raymond E. Parr and Caroline R. Kellogg for Appellant.

Oliver O. Clark and Robert A. Smith for Respondents.

MARKS, J.—Plaintiff brought this action to set aside an agreement and for an accounting of the affairs of a partnership which operated under the name of California Carob Plantations. Judgment was rendered for defendants and this appeal followed.

Under date of April 20, 1920, an equal partnership was formed between the F. D. Cornell Company, a California corporation, and Lawrence Holmes for the purpose of developing, planting to Carob trees, and subdividing and selling a large tract of land in Riverside County, California. Some years later, part of this property was taken in eminent domain proceedings by the Metropolitan Water District of Southern California as a reservoir and dam site. Counsel for defendants now characterize this transaction as producing "a real pot of gold at the end of the rainbow of their dreams," and credits these great and unexpected profits as the principal cause of the present litigation. (See *Metropolitan Water Dist.* v. *Adams* (Cal.App.), 99 P.2d 659.)

Under date of January 10, 1922, a partnership agreement was entered into between the F. D. Cornell Company, Lawrence Holmes and Neilsen and Harris, a partnership composed of Thor H. Neilsen, the plaintiff here, and Gertrude E. Harris, now the defendant Gertrude E. Harris Holmes. Under this agreement Neilsen and Harris acquired a one-third interest in the partnership and its assets for $5,000.

On July 7, 1922, Mary Taylor bought a one-sixth interest in the partnership from the F. D. Cornell Company. An exhibit to the contract of purchase specified the real estate belonging to the partnership as five tracts, one of 480 acres, another of 105 acres less 30 acres, the third of 220 acres, the fourth of 80 acres, and the fifth of 320 acres.

There were other transfers of interests in the partnership which it is not necessary to detail. It is not disputed that on November 24, 1936, Lawrence Holmes had a two-fifths interest, Gertrude E. Harris Holmes a one-fifth interest, Marie O. Holmes a one-fifth interest and Thor H. Neilsen, or her assignee, a one-fifth interest in the partnership. There was no subsequent change in these percentages except the elimination of the assignee of Thor H. Neilsen from the transaction.

Plaintiff gave notice of dissolution of the partnership about April 13, 1936, and she also demanded an accounting of its affairs. In response to the demand for an accounting there was prepared what is referred to as the "Northrop Account," which purported to be a complete accounting of the affairs

of the partnership from January 10, 1922, to July 31, 1936. It contained a detailed list of the assets of the partnership.

Under date of November 24, 1936, Lawrence Holmes and Gertrude E. Harris Holmes, as first parties, and Thor H. Neilsen, as second party, executed a contract to which were attached numerous exhibits including a copy of the Northrop Account. At that time Thor H. Neilsen was represented by at least one of the attorneys who is appearing for her here.

One paragraph of the contract provides in part as follows:

"That the first parties claim and represent that the accounting, a copy of which is attached hereto and marked Exhibit G, is a true, correct, and just accounting of the affairs of the California Carob Plantations partnership and of their management of the same, and of the interests of the respective partners therein, and of all of the partnership holdings, and second party hereby accepts, ratifies and approves it as such, and waives all right to hereafter dispute its correctness, and accepts said accounting and statement thereof as contained in said Exhibit G as full, true and correct and as a final accounting to July 31, 1936, and agrees that paragraph marked 1 of this agreement sets forth correctly the respective interests of the members of said partnership on November 28, 1935. . . ."

This action was filed on July 10, 1943. It sought, among other things, a rescission of the contract of November 24, 1936, and an accounting of all the affairs of the California Carob Plantations from January 10, 1922.

Defendants stood upon and asserted the legality, binding effect, fairness and correctness of the Northrop Account and the contract of November 24, 1936. They realized that plaintiff was entitled to an accounting of the affairs of the partnership after July 31, 1936, when large sums of money had been collected from the Metropolitan Water District under a compromise of the judgment in the eminent domain proceedings. They employed Ralph G. Ritchie, a certified public accountant, who prepared a detailed accounting of the affairs of the partnership from July 31, 1936, the date of the conclusion of the Northrop Account. Among many other things it shows that plaintiff had been paid in cash $31,182.37 and that there was "Impounded by order of court to cover disputed claims: In re Thor Nielsen claim $65153.32." Some of the impounded money has been withdrawn with the consent of the court based on stipulations.

After a lengthy trial findings were made to the effect that there had been no fraud, concealment or mistake in the Northrop Account; that there had been no fraud, coercion, concealment, misrepresentation or mistake in executing the contract of November 24, 1936, from which we have quoted; that plaintiff was bound by its provisions; that the management of the affairs of the partnership by Lawrence Holmes had been fair, equitable and just and in accordance with the rules of law governing a managing partner; that he had not personally profited from his position of managing partner; that the accountings already made were, as slightly modified by evidence, correct, and correctly reflected the condition and affairs of the partnership; that plaintiff had been paid more than she was entitled to as a partner, so that there was no further occasion for further accounting, there being nothing to account for. Judgment was entered for defendants and the impounded moneys were ordered released. No judgment was rendered against plaintiff for return of the overpayments to her which the evidence indicates amounted to $1,542.

Plaintiff presents three grounds for a reversal of the judgment against her, which are as follows:

"*First:* To the right of plaintiff to an accounting for the period from July 31, 1936, forward;

"*Second:* To the proposition that all the properties for which an award was made to any of the defendants herein in either of said eminent domain proceedings are partnership assets; and

"*Third:* To the right of plaintiff to set aside said agreement of November 24, 1936, and said purported accounting as of July 31, 1936, and to obtain an accounting of the affairs of the partnership from its inception."

The arguments presented under the three headings are numerous and varied. They all gather around an attack on the correctness of the Northrop Account and the Ralph G. Ritchie Account which were approved by the trial court and taken as final and conclusive, except as to the exact amount of the overpayment to paintiff which was reduced by the testimony of Mr. Ritchie from $6,828.27, as shown in his account, to $1,542. It appears from his testimony that this adjustment was made necessary not so much from errors in the account as by the settlement of disputes and withdrawals from the impounded funds between the date of his accounting of February 22, 1943, and the time of trial.

In many particulars the evidence is sharply and flatly conflicting. The trial took several weeks and the reporter's transcript contains 982 pages and does not contain copies of many of the well over one hundred exhibits which are before us. It is obvious that to attempt to summarize the evidence on both sides of a disputed question of fact would be a useless consumption of both time and space, as conflicts in the evidence are settled in the trial court and are no concern of ours. It should be sufficient to state that we have studied the entire record, including those exhibits which seem to bear even remotely on the questions to be decided and will here summarize the evidence which tends to sustain the findings and judgment and, although we have it in mind, will give little attention to conflicting evidence.

The books of account were kept, except for a relatively brief period, by Gertrude E. Harris Holmes upon the suggestion and at the request of plaintiff. That Mrs. Holmes was not an experienced bookkeeper is admitted by her and is obvious from her records. Her accounts were kept in books called journals in which, as she testified, are entries of all transactions of money received and expended by the partnership and correctly reflect its financial transactions. In addition there are bank books issued by the banks through which all money of the partnership passed and the checks withdrawing those funds together with the check stubs. · With the help of Mrs. Holmes, who stoutly maintained the correctness and completeness of these records, they furnished the chief basis for the Northrop and Ritchie accounts.

The partnership between the F. D. Cornell Company and Lawrence Holmes was organized under the name of the "Carob Syndicate" by an agreement dated April 20, 1920. It provided that F. D. Cornell and Lawrence Holmes were each to draw a salary of $200 per month.

As we have observed, the partnership of the F. D. Cornell Company, Lawrence Holmes and Neilsen and Harris was formed by a contract dated January 10, 1922, under the name of California Carob Plantations. It placed on the F. D. Cornell Company and Lawrence Holmes the duty of conveying to Neilsen and Harris, third party in the contract, "in trust for the benefit of all the parties hereto, the title to all of the partnership property including lands, contracts, nursery stock, farming implements and equipment of every kind, to be held and handled by said trustees for and on account of the partnership. 3. To nominate third party as the partner in

charge of accounts and authorized to receive and disburse all funds, and handle all matters of detail with reference to the conduct of the business of selling and developing said lands.'' Neilsen and Harris agreed ''to hold the property of the said partnership, formed hereby, in trust for the said partnership; and to convey, release, mortgage, lease, sell, transfer or assign any or all of the said property so held in trust at the request of the majority vote of the said partnership.''

The partnership real property was conveyed to Neilsen and Harris who held title for several years. Finally, record title was placed in Lawrence Holmes.

The contract authorized the partners to act as selling agents with commissions to be paid them on the selling prices. It is silent on the question of a partner drawing a salary.

When it became known that the Metropolitan Water District was proposing to acquire a large tract of land for its Cajalco Reservoir and dam (now Lake Matthews) someone conceived the idea that it would be most advantageous to all landowners, including California Carob Plantations, to place title in one person so that it could be shown that the highest and best use of the entire tract was as a reservoir site and dam site which would be very much more valuable than the combined value of the several smaller tracts which could be used only for farming or tree culture. To this end Holmes acquired the record title to several parcels not owned by the partnership. We will have to consider later, transactions concerning four of these parcels. The soundness of this idea was demonstrated when the Metropolitan Water District was compelled to pay a maximum of over $700 per acre for land that had cost the partnership not much more than $50 per acre, and some of it less.

Many of the arguments of plaintiff revolve around and are settled by the answer to the question of whether or not Holmes was entitled to draw a salary of $200 per month. Also, the right of Mrs. Holmes to receive $50 per month for her services is involved.

The partnership agreement is silent on the question of salaries. Mrs. Holmes testified on these matters to the effect that it was agreed, with Miss Neilsen's express consent, that Mr. Holmes was to receive $200 per month for his services and that Mrs. Holmes was to receive $50 per month for her services as bookkeeper. While this was emphatically denied by Miss

Neilsen, there is considerable evidence in the record tending to corroborate Mrs. Holmes.

Under the partnership agreement of April 20, 1920, F. D. Cornell and Holmes were each entitled to a salary of $200 per month, and evidently some question was raised about this salary for under date of March 22, 1922, the attorney for Neilsen and Harris wrote to F. D. Cornell Company and Lawrence Holmes in part as follows:

"Furthermore, my clients are entitled to an accounting for the $31,000.00 that has been paid in on contracts since June 1920 to Jan 1922. (a period of about 18 months). We have been asking for these things for some time past, but they don't seem to be forthcoming. Mr. Holmes has furnished us with an accounting of $11,000.00 that he has spent for development work, or rather that was incurred because of the development work. He also stated that he had received no salary at all and put in a claim for $200.00 per month from April 1920 to Jany 1922, or a period of about 21 months or $4200.00. Of course, the C.C.P. Co. has no objections to this and neither have my clients. But it leaves $20,000.00 still unaccounted for. We understand that Mr. Cornell paid a salary to himself of $4200.00 (which we have no objection to, of course) and which accounts for some of the $20,000.00 but leaving $16,000.00 still unaccounted for."

Of course, as counsel for plaintiff point out, the salary referred to in the letter accrued before Neilsen and Harris entered into the partnership agreement, but it as least shows knowledge of past salary transactions.

Miss Neilsen purchased the interest of Mrs. Mary Taylor in the California Carob Plantations. Under date of January 31, 1924, and before the purchase, Miss Neilsen wrote Mrs. Taylor in part as follows:

"I am perfectly satisfied with the way the books of the California Carob Company are being kept, and I do not wish to ask for an audit."

The first entry in the partnership books showing salary paid to Lawrence Holmes is under date of September 12, 1922, and shows salary of $200 paid to Lawrence Holmes for one month. Between that date and January 31, 1924, there are sixteen other entries showing salary paid to Holmes as either $200 for one month or a multiple thereof for more than one month.

Miss Neilsen denied having examined any of the items in any of these account books and there is nothing to contra-

dict her. However, she saw the books and had an opportunity to examine the entries and her blanket endorsement of the accounts in her letter to Mrs. Taylor may have influenced the trial court in its conclusion that Mr. and Mrs. Holmes were entitled to salaries.

A copy of the Northrop Account was attached as an exhibit to the contract of November 24, 1936, from which we have already quoted the blanket endorsement of the Northrop Account by Miss Neilsen. The evidence indicates that this contract was given Miss Neilsen by one of her attorneys in his office, where she signed it.

Under the heading of liabilities, we find the following entries: "Mortgage in favor of Marie O. Holmes $9210.00. Note to Marie O. Holmes $2139.53. . . . Loans to Co. by G. and L. Holmes $1726.00. Balance salary, L. Holmes $17,174.96. Balance Commissions, L. Holmes $5,625.10. . . . Balance Salary G. Holmes $1872.95." The real estate owned by the partnership was also listed and did not include property claimed to belong to Mr. and Mrs. Holmes individually.

Miss Neilsen admitted signing the contract but denied having read any of the exhibits attached to it. She thought the contract was delivered to her by one of her then attorneys and signed on his advice. It is inconceivable that an attorney would advise his client to sign a contract that he had not carefully inspected, including all exhibits attached to it. The knowledge of the agent within the scope of his employment is the knowledge of the principal, so Miss Neilsen should not lightly brush aside her approval of the Northrop Account on the ground that she had not read it. She must be charged with knowledge of it when she approved it. The words "Balance Salary" clearly indicate that there was a prior salary charged and paid and a not inconsiderable amount was claimed as salary earned and due. These entries should have put the attorney and Miss Neilsen on notice that salaries had been paid and also that salaries were claimed to have been earned and were unpaid. With this knowledge and notice she should not have signed the blanket approval of the Northrop Account if she intended to contest the matter of salaries for Mr. and Mrs. Holmes. She should be bound by her agreement unless it could be avoided for some legal reason. No salary was asked or charged after the Northrop Account.

As a general rule a partner is not entitled to compensation for his services to the partnership in the absence of a

contract allowing it to him. ▆ Such a contract need not be in writing and may be either express or implied, and its existence is usually a question of fact to be determined in the trial court. ▆ Where the written contract is silent on the question of compensation to a partner an agreement to pay compensation may be established by parol evidence or by the conduct of the parties. (*Dugan* v. *Forster*, 104 Cal.App. 117 [285 P. 384]; *Parigian* v. *Phillips*, 138 Cal.App. 702 [33 P.2d 426].) ▆ Under these rules, the evidence we have outlined amply supports the conclusion that both Mr. and Mrs. Holmes were entitled to the salaries claimed by them.

Plaintiff seeks to avoid her blanket approval of the Northrop Account in the contract of November, 1936, by claiming fraud and concealment on the part of Mr. and Mrs. Holmes and glaring mistakes to her disadvantage in the Northrop Account. One of her complaints is based on the payment of salaries to Mr. and Mrs. Holmes which we have already considered and disposed of.

Another ground of complaint is the acquisition of land in the neighborhood of the partnership property as the property of Mr. and Mrs. Holmes and not as partnership property. The duties of a partner towards the partnership and his right to engage in a business of his own is discussed in *Dennis* v. *Gordon*, 163 Cal. 427 [125 P. 1063], as follows:

''The law governing partnerships is settled by the Civil Code. The relation between partners is confidential. With respect to the firm property and business, each is trustee of the other (sec. 2410). In the conduct of the business each must act in the highest good faith toward the other, and may not obtain any advantage over him by the slightest misrepresentation or concealment (sec. 2411). A general partner who agrees to give his personal attention to the partnership business may not engage in any other business which gives him an interest adverse to that of the firm, or which prevents him from giving to the firm business all the attention which would be advantageous to it (sec. 2436). Except as thus bound he may engage in any other business without being accountable to the firm for the profits thereof (secs. 2437, 2438).''

Plaintiff points out that Mr. Holmes made personal loans from banks with which he purchased land now claimed as his, some of which loans were paid with partnership funds and another which was secured by a pledge of partnership securities.

The loan last referred to was in the sum of $6,000. Mrs. Holmes, the bookkeeper, testified that this loan was made for the benefit of the partnership and she showed where Mr. Holmes had paid $5,981 of the amount borrowed into the partnership bank accounts from which it was withdrawn by the partnership. She said that the $19 shortage between the $6,000 borrowed and the $5,981 returned to the partnership was undoubtedly interest paid on the bank loan by Mr. Holmes personally.

It should be observed that the evidence indicates that up to the time of the settlement of the judgment in the Metropolitan Water District case the partnership was usually short of funds and resorted to various expedients to pay its expenses.

■ Mr. Holmes did make personal bank loans that were repaid by the partnership. Mrs. Holmes testified and the books of account show that the partnership was almost continuously indebted to Mr. Holmes on his salary and commission accounts. (This indebtedness had grown to $17,174.96 back salary and $5,625.10 unpaid commissions, as shown in the Northrop Account.) She also testified that whenever the partnership paid a note for Mr. Holmes it took credit for the payment made on the salary due him.

While this may have been an awkward and unusual method of accounting that might and evidently did lead to serious misunderstanding, the partnership suffered no injury from it. If the partnership checks had been made direct to Mr. Holmes and credited on the salary due him there would have been no cause to complain. The method adopted achieved the same result in another manner. Thus, this money, if used by Mr. Holmes to purchase additional land for himself and Mrs. Holmes, was his money and not funds of the partnership.

There is nothing to show that at the time of these purchases the partnership had the available funds to make the purchases or desired to do so, so it cannot be said that these purchases by Mr. Holmes gave "him an interest adverse to that of the firm" or prevented "him from giving to the firm business all of the attention advantageous to it." (*Dennis* v. *Gordon, supra.*) Therefore, we conclude that the finding to the effect that the property claimed by Mr. and Mrs. Holmes was theirs, with the partnership having no interest in it, finds evidentiary support.

Further, the partnership property was conveyed to Neilsen and Harris, who held title to it for a number of years. Neither

this conveyance nor the several writings signed or approved by Miss Neilsen, which contained descriptions of the partnership property, included descriptions of the Holmes property. It was not until after the Metropolitan Water District appeared on the scene that Miss Neilsen made claim to an interest in any of that land.

The loans made by Mr. Holmes personally and secured with partnership assets reached a high of $16,738 on May 11, 1938, during the expensive litigation with the Metropolitan Water District. According to Mrs. Holmes, supported by certain documentary evidence, the funds were used for the benefit of the partnership.

Plaintiff raised the question of taxes paid by the partnership on its real property and that of Mr. and Mrs. Holmes without segregation on the partnership books. The tax bills were produced at the trial and the segregations made. The evidence of Mrs. Holmes indicates that the taxes paid by the partnership on Mr. and Mrs. Holmes' property were credited on the indebtednesses of the partnership to them.

Plaintiff complains of a payment by the partnership to purchase a packing house at Arlington for use of the Carob Growers Products Company which was a corporation organized by Carob Growers to process their products. Ownership of its stock was limited to growers of carobs. Mrs. Holmes testified that this $1,000 was treated as a payment to Mr. Holmes on his commission account so in fact the payment was made by Mr. Holmes instead of the partnership.

Many other transactions are criticized by plaintiff with explanations similar to those already outlined, so there should be no need of detailing each one of them here.

Plaintiff attacks the indebtedness to Marie O. Holmes, which is shown in both the Northrop and Ritchie accounts as $9,210, secured by a mortgage and $2,139.53 evidenced by a note. The Northrop account lists as liabilities due to Miss Holmes on January 10, 1922, a mortgage indebtedness of $4,500 and an indebtedness of $1,000 on an unsecured note. The evidence shows several payments of interest to Miss Holmes and the payment in full of the original unsecured note which payments Miss Holmes admitted. She testified that she had loaned the partnership additional sums evidenced by unsecured notes. The evidence supports the inference drawn by the trial judge that both accounts correctly reflected the total indebtedness to Miss Holmes, consisting of money

actually loaned by her to the partnership with unpaid accrued interest. Further, as these items appeared in the Northrop Account, they were approved by the contract of November 24, 1936.

Plaintiff produced Frederick A. Pike, a certified public accountant, as a witness in her behalf. He testified at considerable length and found much fault with the Northrop Account, and pointed out what he believed to be many mistakes and inaccuracies. On the other hand, Mrs. Holmes and Mr. Northrop testified to the correctness of the accounting. Also, Mr. Pike reviewed the apportionments made by Mr. Northrop from which the final account was made. He also made spot checks with the books of the partnership. He testified that he found the account substantially correct with his totals only varying between $2,000 and $3,000 from the Northrop totals. Mr. Pike did not make a detailed accounting for the period covered by the Northrop Account. In view of the fact that the Northrop Account covered a period of over 14 years and 6 months, involving several hundred thousand dollars, the relatively slight variance in the figures is not surprising.

The testimony of Mr. Pike merely created a conflict with the testimony of other witnesses produced by defendants which was resolved against plaintiff and in favor of defendants. As we have had to remark with monotonous regularity, conflicts in the evidence are addressed to and settled by the trial court. It follows that the finding that there was no fraud, misrepresentation, concealment or mistake in connection with the Northrop Account nor in connection with the execution of the contract of November 24, 1936, finds evidentiary support and cannot be disturbed here.

It follows that the blanket approval of the Northrop Account contained in that contract still binds plaintiff and bars her from contesting the items of that account (*Estate of Withington*, 60 Cal.App.2d 87 [140 P.2d 482].)

Plaintiff also attacks the Ritchie account and the findings approving it. That account assumed the correctness of the Northrop Account and was a detailed accounting of the affairs of the partnership after July 31, 1936. The assumption of Mr. Ritchie of the correctness of the Northrop Account furnishes one of the principal grounds of complaint of plaintiff as to the correctness of the Ritchie account. What we have already said disposes of this argument which does not need to be pursued further.

Plaintiff also attacks the Ritchie account and the apportionment of the moneys received from the Metropolitan Water District in the condemnation cases. She argues that all of the awards to any of the defendants in this action for any of the lands taken were partnership assets and should have been apportioned among the partners in proportion to their partnership interests.

She argues, as we have already observed, that the property claimed as theirs by Mr. and Mrs. Holmes was partnership property. We have already disposed of this question.

Marie O. Holmes also owned property independent from the partnership. The evidence is clear that the partnership had no interest in this land. At least some of it was conveyed to her as a bonus for extension of loans to the partnership which it could not pay. Her right to her share of the awards for this property cannot be questioned.

■ One of the chief arguments made by plaintiff revolves around substantial profits made by Mr. Holmes under four contracts, one with Paul and Lillie Dale, dated April 8, 1935, two with Arthur S. Holden, dated March 8, 1935, and the fourth, dated March 8, 1935, with John Chambers. We will refer to these respectively as the Dale contract, the Holden contracts, and the Chambers contract. As we have already pointed out, the effort was made to get under one ownership as much of the property as possible in the reservoir and dam site desired by the Metropolitan Water District so as to collect from the district the highest possible price for the land taken. The four contracts were taken in furtherance of this plan.

Mr. and Mrs. Dale owned about 60 acres of land. They agreed to sell this property to Holmes for $10,000, to be paid by him out of any money received by him in the condemnation proceedings, with the further proviso, "that the obligation to purchase said property is binding on said second party" (Holmes) who also agreed to assume all costs, expenses and attorneys' fees in defending the condemnation proceedings. Mr. Holmes performed his part of the contract with a substantial profit remaining, which he claimed as his own.

One Holden contract recited that Holden owned 30 acres and Holmes 160 acres in section 11; that each party would defend the action as affecting his own land; that the net proceeds received by each party, after paying all costs, expenses and attorneys' fees, should be added together, each party receiving his proportionate share thereof. The other Holden

contract was to the same effect except that it recited that Holden owned 80 acres and Holmes 460 acres in section 12. The division in both instances was to be made on the basis of proportionate acreage.

The Chambers contract was similar to the Holden contracts except that it was recited that Chambers owned 40 acres and Holmes 120 acres in the northwest quarter of section 7.

Perhaps all, but certainly part of the property described in the Holden and Chambers contracts as belonging to Holmes, was an asset of the partnership. As we have pointed out, these contracts were part of the general plan to unite the several landowners in a common front in the condemnation proceedings. We have been able to find nothing indicating that Holmes profited directly and personally from them. All landowners, including the partnership, received indirect benefits in the increased value placed on their properties and the partnership received its proportionate share. We can see nothing improper in them as the parties merely pooled their described properties for the purpose of the condemnation actions and agreed to share proportionately in the awards. There was nothing in either transaction that was detrimental to any interest of the partnership. In fact, it benefited from them by enabling evidence to be introduced to the effect that the highest and best use of all the land, including partnership property, was for a reservoir and dam site.

The Dale transaction presents a closer question. Holmes individually made a substantial profit. However, as we have already seen, a partner may engage in business other than that of the partnership when the other business does not give him an interest adverse to the partnership nor prevent him from giving its business all the attention that would be advantageous to it, neither of which is made to appear here. The partnership agreement did not require Holmes to devote all of his time to the partnership affairs nor did it prevent him from engaging in private business. The Dale contract bound him individually to pay $10,000 for the land. If Holmes could buy land for himself, as we have held, certainly he could agree to purchase the Dale property as, in purchasing it, he was not acting adversely to the partnership, but in its favor by enabling it to get a high price for its property.

Many other questions are argued by plaintiff which are covered in a general way by what we have already said. We

will not further extend this opinion by considering each of them. It should be sufficient to say that the trial judge had a difficult problem before him. It involved an accounting of transactions running over a period of 21 years, during which time many hundreds of thousands of dollars were received and disbursed. On an investment of $2,500 the plaintiff received a cash net return of $31,182.27, after there was paid from the gross returns in the condemnation action, total trial expenses and attorneys' fees of over $220,000, not including unliquidated claims in considerable amounts for added attorneys' fees and expenses of litigation. The money to pay these claims was impounded.

Plaintiff's claim that she was entitled to an accounting for the period after the date of the Northrop Account is admitted by defendants. It is satisfactorily met by the Ritchie account, by the evidence indicating that she has received $1,542 more of partnership funds than she was entitled to, so, as far as she is concerned, there is nothing further to account for. The findings of the trial court based on these facts which it accepted as true, must be regarded as final here.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied December 3, 1947, and appellant's petition for a hearing by the Supreme Court was denied December 29, 1947.