Argued April 22, reversed and remanded June 18, 1952

# ROBERTS *v.* MARINER

245 P. 2d 927

*Thomas H. Tongue, III,* argued the cause for appellant. On the brief were Hicks, Davis & Tongue, of Portland, and Thomas Morris, of Corvallis.

*Orval N. Thompson* argued the cause for respondent. On the brief were Weatherford & Thompson, of Albany.

Before Brand, Chief Justice, and Rossman, Latou-
rette, Warner and Tooze, Justices.

TOOZE, J.

This is a suit for the dissolution of a partnership
and for an accounting, brought by Harold L. Roberts,
as plaintiff, against Claude E. Mariner, as defendant.
On January 12, 1951, the trial court entered a decree
effecting an accounting between the parties and dis-
solving the partnership. Defendant appeals.

Plaintiff, a resident of Corvallis, in Benton county,
Oregon, since 1943, opened a real estate and insurance
business in Corvallis in 1945, and thereafter continued
in such business. His office was in rented premises,
and he owned miscellaneous office furniture and equip-
ment suitable to his occupation. At the time of the
trial of this suit, defendant had been a continuous
resident of the city of Corvallis for 11 years. Prior
to December, 1948, he had been engaged in business in
Corvallis as a salesman of refrigeration equipment
and products. On December 1, 1948, plaintiff and
defendant entered into a written agreement of partner-
ship as follows:

"ARTICLES OF PARTNERSHIP
"THIS AGREEMENT, Made this first day of
December, 1948, by and between Harold L. Roberts,
hereinafter called the first party, and Claude E.
Mariner, hereinafter called the second party,

"WITNESSETH:
"I
"That the second party has acquired an un-
divided one-half interest in the real estate and insur-
ance business heretofore owned and conducted by

the first party, with office and place of business located at 118 South Fourth Street, Corvallis, Oregon.

"II

"That said parties hereby agree to continue the operation of said business as partners under the assumed name and style of 'Roberts and Mariner', said partnership to continue for an indefinite time and until terminated as herein provided or as may be mutually agreed upon.

"III

"That the amount of capital contributed to said partnership by said parties is hereby agreed to be the sum of $900.00 each, and is represented by the following personal property, to wit: Three desks; two swivel chairs; One Stenographer's desk chair; One High Bay Gas Heater; One Shaw-Walker file; Insurance files; One Counter; One Royal typewriter; signs and miscellaneous items pertaining to said business.

"IV

"It is hereby agreed that an additional sum of One Thousand Dollars ($1,000.00) shall be set up and reserved from the profits of said business, and shall become and be a part of the invested capital, it being agreed that not less than 10% of the net earnings shall be so reserved until said amount is accumulated.

"V

"That the capital funds of the parnership [sic], and all other moneys of the partnership, shall be deposited in the name of the parntership [sic] in the Corvallis Branch, The United States National Bank of Portland, Oregon, and all trust funds shall be deposited in said bank in a separate account, and all such funds, partnership or trust, shall be subject to withdrawal only be [sic] check made in the name of the partnership and signed by either partner.

## "VI

"That each partner shall devote all his time and attention to the business of the partnership, and shall not, directly or indirectly engage in any other business without the consent of the other partner.

## "VII

"That full and accurate accounts of the transactions of the parntership [sic] shall be kept in proper books, and each partner shall cause to be entered in said books full and accurate accounts of all his transactions in behalf of said partnership. Said books shall be kept at the place of business of the partnership, and each party shall at all times have access to and may inspect and copy any of them.

## "VIII

"Each party shall be entitled to withdraw such amounts and at such times, from the partnership earnings, as shall from time to time be fixed and agreed upon.

## "IX

"That at the end of each calendar year, a full and accurate inventory shall be prepared, and the assets, liabilities, and income, both gross and net, shall be ascertained, and the net profits or net losses of the partnership shall be fixed and determined. The net profits or net losses shall be divided equally between the parties hereto, and the account of each shall be credited or debited with his proportionate share thereof.

## "X

"That neither party shall, without the written consent of the other, make, execute, deliver, endorse or guaranty any commercial paper, nor agree to answer for, or indemnify against, any act, debt, default or miscarriage of any person, partnership, association or corporation, other than that of the parties hereto.

## "XI

"That said partnership may be terminated by eith [sic] party upon giving 60 days notice to the other party of his desire to withdraw, in which event an accounting shall be had and a division of the partnership assets made, provided, however, that the party to whom said notice is given shall have the right to acquire the whole interest of the partnership at a price not to exceed the book value thereof, on such terms as may be agreed upon, and to continue said business under the same business name.

"IN WITNESS WHEREOF, The parties hereto have hereunto set their hands and seals in duplicate the day and year first above written.

"[Sgd.] Harold L. Roberts (SEAL)
Party of the first part

[Sgd.] Claude E. Mariner (SEAL)
Party of the second part"

Thereafter, the parties engaged as partners in the real estate and insurance business. For several months, both devoted their time and energy strictly to that business, plaintiff devoting his principal attention to the insurance business, and the defendant, to the sales of real estate, though this segregation of the work was not the result of any particular agreement between the partners, nor did either devote his exclusive attention to the branch of the business generally carried on by him. It developed that defendant was a good salesman of real estate, and, through the combined efforts of the partners, the business flourished.

The partnership maintained two bank accounts. One was their own partnership account in which were deposited all receipts of the business belonging to the firm. The other was an agent's account, in which were deposited all funds received by the partnership in trust,

such as earnest money paid down on sales of real estate. Insurance premiums paid to the firm were deposited in the partnership account, and not in the agent's account. These funds were not considered trust funds, as the insurance companies simply relied upon the responsibility of the partners for the payment thereof.

When real estate deals were so far completed that the earnest money deposited in the agent's account, or a part thereof, or other funds in said account, belonged to the partners, they were transferred from the agent's account to the partnership account.

As each partner needed funds for his own personal use, he withdrew the same from the firm's account, being charged on the books of the partnership for each withdrawal. At the time difficulties arose between the partners as hereafter mentioned, defendant had withdrawn from the partnership funds for his own personal use approximately $1,000 more than the plaintiff. The total withdrawals of defendant amounted to $2,500.83; those of plaintiff, to $1,515.86.

Expenses incurred by each partner in connection with carrying on the business were paid by the partnership. Also, of course, all expenses in connection with the operation of the business, such as office rental, clerk hire, telephone, etc., were paid out of the partnership funds. When a partner used his own automobile in connection with the business, he was allowed and paid 6¢ per mile therefor.

Real estate transactions were handled by the partnership in the following manner. Listings in writing by prospective sellers of real property were secured. When a purchaser was found who was ready and willing to purchase, a certain sum of money was agreed upon as earnest money to be paid down by the pros-

pective purchaser to bind the bargain. An earnest-money receipt in writing, prepared in triplicate, was executed, naming the purchaser, showing the amount of earnest money paid, describing the property, the purchase price and terms of sale, and signed first by Roberts & Mariner, by whichever partner was making the deal, as agent, and then signed by the prospective purchaser who agreed to buy, and then by the owner of the property, who agreed to sell. The original of the earnest-money receipt was retained by the partnership, and a duplicate was delivered to the purchaser and the seller. The real estate broker's copy was then placed in a large envelope designated as ''Real Estate Broker's Deal Envelope'', and filed in the office of the partnership. Each real estate deal had its own number. On the outside of the ''Deal Envelope'' was written the number of the deal, the date as shown on the earnest-money receipt, the description of the property, the names of the seller and purchaser, the amount of earnest money paid by the purchaser, and the amount of the broker's commission on the sale.

During the latter part of April and the forepart of May, 1949, plaintiff and defendant discussed the matter of constructing some dwellings on certain lots owned by plaintiff and his wife as tenants by the entirety, for sale to World War Veterans, under the plan of financing provided by Act of Congress. The parties are in substantial agreement as to the substance of those conversations and as to what transpired thereafter, but they are in direct disagreement as to what their final understanding and agreement was. It is this disagreement that brought about the difficulties late in September, 1949, which led to the instant litigation.

A determination as to the relationship existing

between the parties in connection with the construction and sale of the houses in question, and the legal effects thereof, will largely solve the problem now before this court for solution. It will, therefore, become necessary to discuss the facts in considerable detail.

■■ At the outset, it might be well to state that the evidence is conclusive that the partnership should be dissolved. As a practical matter, it was, to all intents and purposes, dissolved on April 24, 1950, though the decree of dissolution was not entered until January 12, 1951. It was on April 24, 1950, that the Real Estate Commissioner of the state of Oregon, pursuant to the authority vested in him by statute, cancelled the Real Estate Broker's License of the partnership. Thereafter, the parties acted individually, and the evidence warrants the conclusion that both, in effect, abandoned the partnership relation as of that date. In his brief filed in this court, defendant expresses a willingness to accept that date as the date of final dissolution, and the date up to which an accounting should be had, and plaintiff does not contend for a later date. Under all the facts and circumstances of this case, it would be inequitable to fix a date later than April 24, 1950, although ordinarily the date of the decree would be considered the date of final dissolution.

■ In passing, we make note of the fact that the evidence in this case is wholly insufficient to justify a dissolution of the partnership upon any or all of the grounds alleged therefor in plaintiff's complaint, or at the suit of plaintiff. A court of equity will not decree dissolution of a partnership because of temporary or trifling disputes among the partners, or for animosity between partners which does not injuriously affect the partnership business, or because of technical opposition of a partner to the spirit of the articles

of copartnership, where nothing dishonest or extravagant is shown and the conduct of the business is profitable. 68 CJS, Partnership, 858, § 349b(4).

The first ground assigned by plaintiff for dissolution of the partnership is that defendant never contributed the sum of $900 to the capital as required by the copartnership agreement. The evidence shows that, when the agreement was made, defendant executed and delivered to plaintiff his promissory note in the sum of $900, due in one year, and the same was accepted by plaintiff, in settlement of defendant's obligation respecting the capital stock contribution. At the time the complaint was filed, the note was not yet due. Furthermore, if defendant's contention respecting the matter is correct, he had a perfect defense to the note when it was due. We observe that plaintiff has commenced action on this note, and that that case was pending at the time of the trial of the instant litigation.

As a second ground for dissolution, plaintiff alleged that defendant refused to reserve ten per cent from the net earnings of the partnership for the purpose of establishing a reserve of invested capital in the sum of $1,000. The evidence establishes that both parties ignored this provision of the contract. At no time did either insist upon its fulfillment. If either is guilty of wrong in that respect, both are guilty.

Third, plaintiff alleged that defendant had wrongfully made "at least one improper withdrawal of money" from the agent's account. The evidence discloses that, at one time, defendant did withdraw $200 from the agent's account and immediately deposited it in the partnership account, and then withdrew $200 from the partnership account for his own use. Later, according to plaintiff, he returned the $200 to the agent's account. However, the evidence does not show

that at the time defendant made the withdrawal there were no funds in the agent's account belonging to the partnership. But even if the withdrawal was technically wrong, it was more or less an isolated act, and not such a serious one as to justify the dissolution of the partnership. Moreover, in the light of the entire record, it is clear that this objection is purely an afterthought on the part of plaintiff; one of the straws he grasped at when, for his own purposes, he determined to get rid of defendant.

As his fourth ground for dissolution, plaintiff complained that defendant had withdrawn more funds from the partnership account than he had withdrawn. He alleged that defendant had withdrawn $975.77 in excess of what he was entitled to up to the time complaint was filed in this suit. The evidence does not disclose that plaintiff ever objected to these withdrawals by defendant until after the difficulties arose between the parties as hereafter discussed. Neither does the evidence reveal that there were not sufficient funds in the partnership account from which plaintiff could have, at any time, made withdrawals to equal those of defendant, and, in fact, there were enough such funds when suit was instituted. From the record, we conclude that this also was an afterthought on the part of plaintiff.

As a further ground for dissolution, plaintiff claimed that defendant had violated certain regulations respecting real estate advertising. He alleged that this improper advertising had brought a reprimand to the partnership from the Real Estate Commissioner of the state of Oregon. It appears that prior to Thanksgiving Day, 1949, the partnership had advertised in a Corvallis newspaper that the firm would give a turkey and "all the trimmin's" to each purchaser of

real property who purchased through them prior to Thanksgiving. Following the Thanksgiving holiday, the partnership further advertised in part as follows: "A Turkey and All the Trimmin's with every home we sell between now and Christmas day. Our Thanksgiving special was so successful, we have decided to continue it until Christmas day", etc. Complaint about this method of advertising was made to the Real Estate Commissioner by the Corvallis Realty Board. Under date of November 23, 1949, the Commissioner wrote the partnership, calling attention to the rules and regulations respecting advertising, requesting that the particular advertising in question be discontinued, and suggesting that a retraction be run in the same newspaper in which the advertisement had been appearing. Defendant replied to this communication immediately, agreeing to discontinue the advertising, and forthwith caused to be printed a retraction in the newspaper under the title "We are Sorry". Although, as a witness, plaintiff endeavored to show that he knew nothing about this advertising, nevertheless, we are convinced that he did know about it, and made no objections thereto until after the Real Estate Commissioner had acted. His testimony with respect to this matter offers a glowing example of the art of hedging, dodging, and evasion. It is unworthy of serious consideration.

Finally, plaintiff alleged that "the disagreements and dissention existing between the partners preclude any chance of the enterprise being successful." In part, that might be true, but whatever dissention there might have been between the partners was of plaintiff's own making, and not because of any misconduct on the part of defendant, as will readily appear as we discuss the other facts of the case.

We are not at all impressed with plaintiff's

testimony respecting the grounds claimed by him for dissolution of the partnership; nor, as will later become evident, are we impressed with his version of the transaction between the parties regarding the house construction and sale project. As a witness on cross-examination, and when being examined as to vital issues in the case, plaintiff was extremely evasive; so much so, in fact, that the trial judge made note of it at one point. The court said: "What is your answer to this question? You're evading it, it seems to me." Further, the record is replete with instances where plaintiff answered "I don't know" or "I don't remember" when, under all the facts and circumstances of the case, it is manifest that he should have known and should have remembered. This was particularly true when he was being examined with reference to certain alterations of the partnership records which are hereafter to be discussed.

It appears that during the latter part of April, 1949, the attention of the partners was called to the fact that the Veterans Administration, in conjunction with the Federal Housing Administration, was insuring loans for the purchase of homes by War Veterans, in amounts up to 100 per cent of the appraised values of the properties. Plaintiff and defendant discussed the matter and decided that, if satisfactory arrangements could be made regarding the loans, it might be a profitable venture for the firm to construct a group of dwelling houses for sale to veterans. Plaintiff suggested that he had a group of lots in Corvallis upon which the houses might be constructed. This land was owned by plaintiff and his wife as tenants by the entirety.

With the knowledge of plaintiff, defendant telephoned to Mr. E. E. Tate, Loan Guarantee Officer for

the Loan Guarantee Division of the Veterans Administration, at Portland, and made an appointment to discuss the proposed loans. Defendant went to Portland alone and interviewed Tate. Tate explained the details of the procedure for securing such loans, and suggested four lending agencies in Portland which might be contacted concerning them. The actual loans were made by private lending agencies, the Veterans Administration and FHA insuring them up to the full amount thereof, on the basis of 20 per cent by the Veterans Administration and 80 per cent by FHA.

Among others, defendant interviewed Commonwealth, Inc., and Dean Vincent, Inc., two lending agencies located in Portland, both of which expressed interest. Upon his return to Corvallis, defendant made a full report to plaintiff, and the parties further discussed the project in the light of this report. Plaintiff then made a trip to Portland and interviewed officials of Commonwealth, Inc., and Dean Vincent, Inc. Upon his return to Corvallis, he reported to defendant that the outlook for securing financing by Dean Vincent, Inc., was favorable.

A short time later, both plaintiff and defendant, accompanied by three contractors, again went to Portland to confer with Veterans Administration officials and with Mr. Campbell, loan officer of the Dean Vincent company, and also to inspect houses in and near Portland which the Veterans Administration had theretofore approved for insured loans, and where its commitments had already been issued. A "commitment" is a written document issued by the Veterans Administration in which is stated the maximum amount of loan on the property that it will insure. The parties inspected several of such housing projects.

Within a few days thereafter, the chief appraiser for the Veterans Administration, together with Mr. Tate, made a trip to Corvallis and inspected the property owned by plaintiff and his wife. The Veterans Administration makes use of designated appraisers, but these appraisers are not regular employes of the federal government. This also is true of FHA. Each agency makes its own appraisal before making a commitment. Both make a charge of $20 for each lot appraised as the appraisal fee. The Veterans Administration appraised nine of the fourteen lots at $1,150 each, and five at $1,050 each.

The parties, after many discussions, finally decided to proceed with the project. They agreed to bear equally the expenses incident to carrying out the program, and each was to have one-half the net profits arising from the selling of the houses. As to this part of the agreement, there is no dispute between the parties. The dispute arises as to the price to be paid plaintiff and his wife for each lot, such price to be deducted from the sales price of the completed house, along with other expenses, before the net profit on the sale was determined. Defendant contends, and so testified, that it was agreed between the parties that plaintiff should be allowed a price of $1,150 for each lot, free and clear of encumbrance, regardless of whether the lot had been appraised at that amount, or at the lesser amount of $1,050. On the other hand, plaintiff maintained that it was agreed he should receive $500 net for each lot, and that all encumbrances against the same were to be paid off by the partners, share and share alike. It appears that there were city sewer assessments aggregating approximately $3,000 against the property, and with prospects of some further city assessments. Plaintiff contends that the

matter of the sewer assessments was fully discussed by the parties before the agreement between them was finally made. Defendant denied this.

As will later appear, the overwhelming weight of the evidence and all the circumstances of the case, support defendant's position relative to the agreement between the parties.

Shortly after the property had been appraised by the Veterans Administration, the partnership caused blueprints to be made for some of the proposed houses. Bids for the construction of the houses were called for in the name of the firm, and were addressed to, received and accepted by, the partnership. Final arrangements for financing the project were made with Dean Vincent, Inc. There was some delay in the commitments from FHA, but eventually all financial arrangements were completed.

All expenses for appraisals, blueprints, traveling, etc., in connection with the project were paid out of partnership funds. Both parties devoted much of their time to the venture, and, commencing the latter part of September, 1949, plaintiff devoted practically all of his time to it.

After the bids of contractors had been received for the construction of the houses, and the parties knew exactly what the cost of each house would be, including all incidental expenses, they together figured out the sales price at which they would sell each house, and the net profit to be derived from such sale. At that time, and as a part of their calculations in this regard, defendant wrote out the figures on a slip of paper, which slip of paper was placed in the files of the firm, and was admitted into evidence on the trial. That exhibit is as follows:

| | "8250 | 9350 | 9700 |
|---|---|---|---|
| Lot | 1150.00 | 1150.00 | 1150.00 |
| App FHA | 20.00 | 20.00 | 20.00 |
| Vet | 20.00 | 20.00 | 20.00 |
| Plans | 25.00 | 25.00 | 25.00 |
| | 1215.00 | 1215.00 | 1215.00 |
| Bid | 6200.00 | 7000.00 | 7450.00 |
| Misc | 50.00 | 50.00 | 50.00 |
| | 7465.00 | 8265.00 | 8715.00 |
| Sell | 8250.00 | 9350.00 | 9700.00 |
| | 785.00 | 1085.00 | 985.00 |
| | 5 | 4 | 5 |
| | 3925.00 | 4340.00 | 4925.00 |
| | 4340.00 | | |
| | 4925.00 | | |

13190.00"

From the foregoing it is apparent the parties figured on a net profit of $3,925 on five of the houses, $4,340 on four, and $4,925 on the remaining five. It is significant to note that each lot was listed at the price of $1,150. This is the only writing that directly indites the understanding between the parties. It supports defendant's contention.

On the face of this writing there appear some additional figures. Plaintiff admits that he placed those figures on the paper, but he does not remember when he did so. They are as follows:

"7000
13190

20190.00"

This is but one of the instances of the alteration of records by plaintiff. The figure "7000" was intended by plaintiff to represent the price of 14 lots at $500 each. It is manifest that he was endeavoring to provide evidence to support his theory, but, in doing so, he apparently stubbed his toe. It is quite evident that he overlooked the $1,150 already set forth in the principal writing as the price of the lot. The figures he wrote on the paper are not explainable under any theory of the case.

Plaintiff, as a witness on his direct examination, testified as follows with reference to these figures:

"Q What would those figures represent there, if anything, that you know?

"A Mr. Mariner was always eager to figure out something, so he was figuring out the profit on here before anything was built, I guess, costs and everything, so this is his figures here except down at the bottom here, there is a $7000.00 and it looks like $13190.00, making a total of $20, 190.00.

"Q You know what that represents?

"A Yes, the $7000.00 represented the price of the lots.

"Q Well, was that ever considered by you or at what figure per lot?

"A It was 14 lots. $7000.00 would make $500 a lot.

"Q Whose figures are that?

"A Those are mine.

"Q Is there anything else about that figure that you see as material?

"A No, I don't see anything that is material.

"Q About the date of that now, when those were made, was that in your first talk?

"A No, sir, this couldn't have been in our first talk. The first talk was when the picture was pro-

duced, then on the second talk and about May, I think the picture was in about April, we was talking about building, and then in May this thing came up, and these were the figures that were figured out about in May.''

On cross-examination, he further testified:

"Q No. No. Now, the figures that you had there a while ago where you and he together figured up the total profit to be made on this thing—

"A We didn't figure that up together. That's his figures.

"Q Yes, but you were there at the time, were you not?

"A He testified I put it in the files, and I didn't do any such thing. I don't know how it got in the files.

"Q My question was, you were there when he made those figures, were you not?

"A I don't remember whether I was or not. Those are my figures on the bottom of it.

"Q When did you put them there?

"A I don't remember when I put them there.

"Q And what was your purpose in putting them there?

"A Well, evidently it shows that the price of the lot on there.

"Q And it also shows the profit which he testified that was figured up there?

"A I presume that's what it is.

"Q And you added the two together?

"A Evidently it's my figures, —

"Q Do you know what you had in mind when you were doing that figuring?

"A Figuring on a profit, certainly. Don't do anything to figure. You figure out whether you're going to make a profit or a loss, if you're going into anything.

"Q But you were figuring on going in with Mr. Mariner on this thing?

"MR. WEATHERFORD: Your Honor, the witness has testified that he did, he made that proposal. Seems to me there is no use of reiterating that time and again."

Inasmuch as the record title to the lots stood in the names of plaintiff and Hulda M. Roberts, his wife, it was required that they sign all the contracts for construction of the houses, as well as the original notes and mortgages to Dean Vincent, Inc. Immediately upon completion of a deal for a house, the note and mortgage given by plaintiff and his wife. were cancelled, and the note and mortgage of the purchaser were accepted in lieu thereof.

In his brief filed in this court, plaintiff presents the following argument:

"There is another reason why the defendant cannot prevail in this case. The land concerning which he claims to be a partner in the construction of the houses was owned by plaintiff Roberts and his wife Hulda. It is not claimed in the evidence that Mr. Mariner had any conversation with Mrs. Roberts or that he asserted any agreement with her. This court held in Devereaux vs. Cockerline, 179 Or. at 248:

' * * and Mrs. Cockerline's construction of it is not relevant unless she was a party to it.'

Mrs. Roberts, owner of this land with her husband as tenants by the entirety, and who signed all of the contracts and all of the mortgages and all the deeds that are exhibits in this case pertaining to the transfer of this land, was not even mentioned in any of the testimony of the appellant."

It is true, as plaintiff argues, that Mrs. Roberts was not directly a party to the agreement between plaintiff and defendant regarding the house construction and sale project. It also is true that her signature to the notes, mortgages, deeds, and contracts was nec-

essary in order to carry out the program. But all this is beside the issue here. She is not a party to this litigation, nor is any relief sought against her. She did not even testify on the trial. Under the agreement between plaintiff and defendant, plaintiff was obligated to furnish the necessary lots at the agreed price of $1,150 each. It was wholly immaterial to defendant how plaintiff might accomplish that end. It is evident that plaintiff was able to secure his wife's cooperation, but her cooperation was primarily for the purpose of enabling plaintiff to fulfill his own obligation. Her acts are wholly immaterial insofar as the right to a division of the profits from the sales between plaintiff and defendant are concerned. She may have some recourse against plaintiff for a part of his share of the profits, but that question is not involved in this suit. Of course, she could have refused to participate in the venture in any way, in which case the whole program would have failed, but that was a chance plaintiff and defendant took when they entered into the undertaking. It is unnecessary for us to consider what the situation might have been as to any liability to defendant on the part of plaintiff had plaintiff been unable to perform his part of the agreement.

We observe, however, that plaintiff and Mrs. Roberts evidently enjoyed a good bargain in the sale of their lots. This may account for the willingness of Mrs. Roberts to cooperate. It appears that a short time before this house construction program was instituted, plaintiff and his wife sold two lots located in the same block of Roberts Addition as were the fourteen lots, and adjoining, for the sum of $1,375, free and clear of all encumbrances. They also sold other lots in the same addition, the highest price received for any one of them being $850, free of encumbrance. Similar sewer

assessments existed against those lots as existed against the 14, and had to be paid by the sellers at the times of the sales.

After the bids of the contractors for the construction of houses had been received and accepted, and financing had been assured, defendant immediately embarked upon a sales campaign for and on behalf of the partnership. During July and August, 1949, defendant negotiated several sales to veterans, and also some during the month of September. He made others later. We shall list the July, August, and September sales, as shown by earnest-money receipts, setting forth the date, the name of the purchaser, the sales price agreed upon, the amount of earnest money paid down, a brief description of the property, and some additional data, in each case:

1. July 11, 1949; James E. Bailey, purchaser; price, $9,700; earnest money, $300; lot 16, block 4, Roberts Add. On the face of the receipt are written the following endorsements: "according to FHA and VA payments; Depending on FHA commitment as of about Aug. 1, 1949". The receipt is signed by "Roberts & Mariner, by C. E. Mariner", as agent, and by "Roberts & Mariner, C. E. Mariner", as seller. The purchaser signed the agreement to purchase.

2. July 12, 1949; John F. Engle, purchaser; price, $9,700; earnest money, $300; lot 8, block 4, Roberts Add.; contains same endorsements, and is signed as above in Bailey contract.

3. July 12, 1949; G. Morris Robertson, purchaser; price, $9,700; earnest money, $50; lot 8, block 4, Roberts Add.; contains same endorsements, and is signed as above in Bailey contract by the agent; no signature by the seller. Purchaser also signed agreement to purchase.

4. July 16, 1949; Darrell C. Lambert, purchaser; price, $8,250; earnest money, $300; lot 4, block 4,

Roberts Add.; contains same endorsements, and is signed as in Bailey contract.

5. July 28, 1949; Glen W. Robertson, purchaser; price, $8,250; earnest money, $50; lot 12, block 4, Roberts Add.; contains same endorsements, and is signed as in Bailey contract.

6. August 2, 1949; Jack Wilson, purchaser; price, $9,350; earnest money, $300; lot 7, block 4, Roberts Add.; contains same endorsements, and is signed as in Bailey contract.

7. August 2, 1949; Robert P. Sweeney, purchaser; price, $8,250; earnest money, $50; lot 10, block 4, Roberts Add.; contains same endorsements, and is signed as in Bailey contract.

8. September 10, 1949; John A. O'Connor, purchaser; price, $9,850; earnest money, $400; lot 11, block 4, Roberts Add.; contains similar endorsement reference FHA, and is signed as in Bailey contract.

9. September 22, 1949; Elmer C. Ingle, purchaser; price, $9,850; earnest money, $50; lot 15, block 4, Roberts Add.; contains similar endorsements, and is signed by agent as in Bailey contract. No signature by seller. Purchaser also signed agreement to purchase.

It will be observed that in all but two of the earnest money receipts involved in the above-mentioned sales, Roberts & Mariner were named as the seller, and in the two, no signature whatever appeared for the seller.

For each of these transactions a deal envelope was prepared, into which the earnest money receipt was placed, both the original and the seller's duplicate copy. Data appears on the outside of each deal envelope as indicated above in our description of the use of the deal envelope in connection with all sales of real property by the partnership. These deal envelopes, with their contents, were duly filed in the firm's records.

It appears from the evidence that during the latter part of September, 1949, the city of Corvallis demanded immediate payment of the sewer assessments against the properties involved. At that time plaintiff demanded of defendant that he pay one-half due on the assessments. Defendant refused, contending that payment of the assessments was included in the agreed price of $1,150 for each lot, which was to be deducted from the total sales price of each house. In this connection, plaintiff, on direct examination, testified:

"A  Never had any more conversation on that till it came time for the payment of the sewers.

"Q  Well, tell us the date as near as you can?
"A  Well, it was around the middle of September, 1949.

"Q  Well, what did you say then and what did he say?
"A  I told Mr. Mariner that I had notice that these sewers had to be paid for, that the City was making up foreclosure papers, and they had to be paid for, so that if we did construct the houses that the lots would be clear and they had to be paid for, and he told me that he didn't have any money.

"Q  Did you mention then anything else about any of the other expenses?
"A  Not at that time.

"Q  What else did you ask him about money?
"A  I told him, I didn't ask him. I told him if he didn't have any money he couldn't expect to get anything out of it. That if I had to bear all the expenses myself, why he couldn't expect to get anything out of it."

On October 29, 1949, plaintiff addressed a communication to defendant reading as follows:

"Corvallis, Oregon
October 29, 1949

"Mr. Claude E. Mariner:

"Please be advised that, in accordance with our conversations of October 27 and of approximately six weeks ago, you have no interest whatsoever in the houses my wife and I are building in the block bounded by Fillmore and Lincoln, and 34th and 35th Streets, in Corvallis. As previously stated, you will be entitled, so long as you are my partner, to share in the commissions, if any, from the sale of the said houses.

"[Sgd.] Harold L. Roberts"

On cross-examination, plaintiff testified as follows:

"Q Just what was your purpose or your meaning that you had in mind to convey by this letter, that he had no interest in these houses?

"A Well, just what I stated here before.

"Q He had been claiming an interest in the profits, net profits, hadn't he?

"A That's right.

"Q Up until that time?

"A No, I didn't hear. He never said a word after I told him he wasn't having anything in it, along the middle of September until a day or two before I wrote this letter, then he asked me if I was of the same opinion, and I asked him what opinion, and he said, 'Giving me anything out of those houses,' and I said, 'No, you never put anything into it, how do you expect to get anything out of it.'

"Q Sure.

"A Sure.

"Q And you had told him then about 6 weeks before that, which would bring it somewhere around the 15th of September?

"A Something like that.

"Q And that was the first time that you had told him that thing?

"A When he didn't have money to pay for the sewers, that is correct.

"Q About the middle of September when this sewer proposition was mentioned?

"A I think I have told you about 12 times that is correct.

"Q So that he went along then from the time this project was initiated down about to the middle of September before you ever told him that he had no interest in it?

"A There wasn't any money question come up until that time.

"Q There had been a lot of sales made, hadn't there?

"A Apparently.

"Q And at that conversation?

"A No. Those sales were not final until we heard from FHA. They were all pending on FHA, every sale was pending on FHA and that was not a final sale until we heard from FHA, in the last of September.

"Q It was after you had sold one house for $9700.00 cash, wasn't it?

"A I can't recall that to mind right now.

"Q You can't call it to mind.

"A What was after?

"Q This conversation about the sewers?

"A It was not. Now, wait a minute now. Let me look that one up. It was not. This also was depending on FHA also as of about August 1st, and we never got the commitment from FHA until the last part of December, so it was not sold for cash because we didn't know whether it could be sold or not until we heard from FHA.

"Q When did you get the cash on that $9700.00 house?

"A  Well, I would have to look in the books to find out because I don't just know when this cash came in.

"Q  Haven't you got your deposit book here so you can show when you deposited it.

"A  That check was made to me; it's not in here.

"Q  Your personal account would show that?

"A  Yes, sir.

"Q  And at that conversation, that was the first time that this sewer question was mentioned, wasn't it?

"A  It was not.

"Q  And isn't it a fact that at that conversation Mariner told you 'now, nothing doing, just forget it, forget that'?

"A  At which conversation are you talking about now?

"Q  At which you told him verbally that he had no further interest in this project?

"A  What time you talking about?

"Q  About the middle of September?

"A  He never said a word when I told him. He just went on.

"Q  You're sure of that?

"A  I'm sure of that.

"Q  Then why was it necessary for you to notify him in writing later on?

"A  Because I wanted it in writing."

The testimony indicates that plaintiff did sell one of the houses for $9,700 in cash, and deposited the money in his own personal bank account. Later, it appears that he drew a check in favor of defendant for one-half of a five per cent real estate commission on that sale, which check defendant refused to accept, claiming he was entitled to one-half the profits.

As to these matters, defendant, on direct examination, testified:

"Q Was there anything said at any of these conversations about your paying one-half of the sewer and one-half of the other improvements of these lots?

"A The only mention was until the September note by the City that they were going to foreclose if sewer assessments were not paid. The only mention was that we were to share equally in the costs that would be involved in the blueprints and appraisals and improvements of the lots, but no sewer cost was ever mentioned to me until the City decided that they would foreclose if those costs were not paid. Mr. Roberts talked about his lots and we talked about the prices we would ask people if they wanted to buy lots, and always the figure was at $650 or $750 or thereabouts, which included what he said he had paid for sewer assessments.

"Q And did he give you to understand that the sewer assessments on these lots were paid?

"A I don't know whether he tried to get me to understand that, but he never mentioned that they were not paid and I assumed that they were.

"Q Mr. Roberts stated that you told him that you had no money with which to pay the sewers. Will you explain your version of that?

"A At the time he mentioned to me, which I believe was the following day after publication of notice that the City was going to foreclose on property if the sewer assessments were not paid, he asked me at that time if I could dig up money enough to pay half of the sewer assessments on those lots. I told him that right at the moment I could not, and that it was not my obligation in the first place to dig up money to pay the sewer assessments on those lots because we had discussed the price of the lots, it had been settled and it was his obligation. Incidentally, I told him further that, I noticed that he testified that I didn't say anything more. I told him further at that time after he had informed me that I would have no interest if I didn't dig up some of this money, I told him further that no one

partner could take the interest of another partner away from him just voluntarily and that I wanted to hear no more of any such talk of trying to take any interest away from me on this project. He also remarked at the time that 'my wife said that you're not going to get a cent out of this as long as she has anything to do with it.'

"Q That, of course, was long after your partnership agreement that you heard was testified to?

"A That was about the middle of September. That was at about the time that this foreclosure was threatened by the City unless the payments were made."

The controversy of the parties respecting payment of the sewer assessments marked the commencement of their difficulties, which finally terminated in this litigation. However, immediately following these discussions between them in September, 1949, plaintiff started, and continued, a course of conduct that cannot be approved nor condoned by a court of equity. We shall mention some of his acts, all of which were unquestionably prompted by a desire and intent to bolster his case against defendant.

We have previously mentioned his alteration of the exhibit containing defendant's figures regarding the potential profits of the venture.

Above we noted the fact that all expenses incident to launching the housing project, including the personal expenses of the partners, had been paid out of partnership funds, and had been charged on the books as expenses of the partnership. After the trouble arose between the parties, and not before, plaintiff caused the firm records to be altered so that what he believed to be all of such expenses were charged to him individually. However, in so charging himself upon the books of the partnership, plaintiff wholly failed to

include any portion of the running expenses of the office, though the office and all of its facilities were used to further the construction and sales program.

Plaintiff further caused very material changes to be made in connection with the earnest-money receipts prepared and used by defendant in the several sales negotiated by him, and also caused erasures to be made on the deal envelopes and new data entered thereon. As to the earnest-money receipts in question, plaintiff, without defendant's knowledge or consent, surreptitiously removed them, or caused them to be removed, from the deal envelopes, and then threw them into a waste-paper basket, where they were later found by defendant. He then prevailed upon the purchasers to execute new earnest-money receipts in lieu of the originals, in which receipts the seller was designated as Harold L. and Hulda M. Roberts, instead of Roberts & Mariner, and were so signed. He sought to explain this by claiming that Mr. Campbell of Dean Vincent, Inc., insisted upon that course of action. It is significant to note, however, that Campbell was not called as a witness to corroborate this claim. Moreover, from the several deal envelopes there was erased the name of the seller as originally written thereon, and the names of Harold L. and Hulda M. Roberts were substituted. We think that a great deal of light might be thrown upon this whole case by quoting somewhat extensively from the cross-examination of plaintiff regarding these alterations of the records. He testified:

"Q Mr. Roberts, on any of these envelopes which I have introduced in evidence where you have testified that you signed the name Roberts & Mariner—I mean, Harold L. Roberts or Harold L. and Hulda M. Roberts as being the person to whom property was sold, had there been anything else

written on that line on either of those envelopes before you wrote those words?

"A I don't remember.

"Q Well, those that contain your handwriting, don't you know whether you got down an envelope and made a new file or whether you took an old envelope and erased something?

"A I don't remember the time those was done.

"Q You don't remember at the time those were done?

"A No, I don't remember when they were made out, just specific each time.

"Q No, I don't care anything about the time, but it hasn't been very long ago, has it?

"A It hasn't been a year, no.

"Q And you wouldn't say whether you had erased the names Roberts & Mariner before you wrote the names Harold L. & Hulda M. Roberts on any one of those envelopes?

"A No, sir, don't remember of erasing it.

"Q Would you testify now under your oath, Mr. Roberts, positively that you didn't erase, make such an erasure?

"A No, sir.

"Q But you will not testify that you did?
"A No, sir.

"Q Or caused to be done?
"A No, sir.

"Q I'll ask if it isn't a fact that you caused this girl in your office to take some of these envelopes though that you didn't sign, and erase from those envelopes the names Roberts & Mariner and write the names Harold L. & Hulda M. Roberts in their place?

"A I do not remember the occasion.

"Q Or would you testify under your oath that you didn't have that done?

"A No, sir.

342

"Q But you wouldn't testify that you did?

"A No, sir.

"Q No. And isn't it a fact that about the time that the names Harold L. & Hulda M. Roberts were written on each of those envelopes, that you or someone under your direction removed from each of those envelopes the contents thereof which contained positively, among other things, but at least contained the purchase money receipt of the purchaser which had been issued by Roberts & Mariner by Claude E. Mariner?

"A May I explain?

"Q Well, answer the question first, and then explain.

"A Possibly I did. Possibly it was done with the man from Dean Vincent, Inc.

"Q It was done by Dean Vincent, Inc.?

"A I say, it's possible.

"Q Well, how did Dean Vincent ever have your office files?

"A They was in the office there to make out these applications and they couldn't make them out Sold by Roberts & Mariner because Roberts & Mariner didn't own the property and they couldn't put the deal through.

"Q Couldn't put the deal through?

"A No, sir, with the signature of Roberts & Mariner.

"Q Now, state whether or not anybody from Dean Vincent's office did remove any of the purchase money receipts from either of these envelopes which I have introduced in evidence?

"A I wouldn't say that they did.

"Q You wouldn't say that they did.

"A No, sir.

"Q Isn't it a fact, Mr. Roberts, now, you realize that you're under oath?

"A That's right.

"Q Sworn to tell the truth?

"A That's right.

"Q Isn't it a fact that this is what you did. After you decided to not permit Mr. Mariner to share in the profits of this project, that you undertook to and and did change your office records particularly these envelopes which I have introduced in evidence, so as to show Harold L. & Hulda M. Roberts as the persons for whom the property was sold instead of Roberts & Mariner?

"A That's who they were sold for, Harold L. and Hulda M. Roberts."

Obviously, the excuse plaintiff offered about the necessity of the earnest-money receipts being signed by himself and wife is absurd. It was only necessary that they sign the building contracts, notes, mortgages, and deeds, and, plainly, that is all the Dean Vincent company could possibly be interested in. It is manifest that plaintiff's real reason was to get rid of the signature of "Roberts & Mariner" as the seller, and thereby destroy some very potent evidence that so definitely corroborated defendant's version of the agreement between them.

On cross-examination, plaintiff further testified respecting the earnest-money receipts issued by defendant in July, August, and September, and hereinabove described, as follows:

"Q We introduced some 9, I believe, original purchase money receipts here yesterday and I suppose they are in one bunch. I would like to see those. Mr. Roberts, will you examine Defendant's Exhibit marked 7-1 to 7-9, both inclusive, and state, if you know, what those are?

"A Yes, these are earnest money receipts.

"Q Given by whom?

"A Well, it says Roberts & Mariner by C. E. Mariner, signed illegally by Roberts & Mariner by

C. E. Mariner, the seller, had no interest in it whatever.

"Q Now, don't mix your lingo as to illegality as to what you are reading from that envelope. Tell us what the document shows and express your ideas of the law afterwards. What are those documents?

"MR. WEATHERFORD: Well, just a minute, he's already said what they were. They were earnest money receipts.

"Q Each of those sets?

"A Part of them are not signed, I see. Elmer C. Engles is not signed. Here's one for Darrel C. Lambert that nobody bought a house by that name.

"Q Don't you know that he made a deposit of earnest money and then couldn't make his payments and you refunded it to him?

" * * * * * *

"Q All right, but that does show an earnest money receipt, doesn't it, signed Roberts & Mariner by C. E. Mariner?

"A That's right.

"MR. WEATHERFORD: What exhibit are you talking about?

"MR. MORRIS: I don't know what exhibit he's talking about.

"A 7-4. The purchaser never got a copy of his statement at all.

"Q I'm not asking you that. Now, don't get those exhibits mixed up.

"A Null and void.

"Q You must be quite a lawyer or think you are pretending to say when a thing is void and null and legal or illegal. They are all purchase money receipts and they were kept as a part of the files in your office, were they not?

"A They were not correct so they were discarded, I guess.

"Q You guess?

"A That's right. They were not correct so they were discarded, they couldn't be used.

"Q Why couldn't they be used?

"A Because they are signed as Roberts & Mariner, seller.

"Q And when did you take those out and secure new ones to take their place?

"A When the Dean Vincent sent people down to write up the applications for the veterans.

"Q When was that?

"A I can't tell you the date. Their corresponding date will be on the ones in the envelopes, I think.

"Q That is, when you made out these new ones, you made the new ones to bear the same date that the old one did?

"A I don't know; I'd have to look and see.

"Q Well, then, from recollection, you ought to be able to tell approximately what you did?

"A Well, I don't think anyhow, whether I ought to be able to or not, I don't.

"\* \* \* \* \* \*

"Q Now, you undertook to destroy those, didn't you, and thought you had destroyed them, but threw them in the wastebasket?

"A I did not. If I wanted to destroy them, I would have burned them up.

"\* \* \* \* \* \*

"Q Now, you changed all of those original purchase money receipts given by Mariner, didn't you. You changed them all just as you did these you testified to?

"A They had to be.

"Q And you did it?

"A Yes, sir.

"Q What did you do with the other originals than those that were found and brought here?

"A Well, they probably were put in the same place."

We have not heretofore mentioned the sale of one of the houses to one Wilbur M. Douglass. On October

31, 1949, defendant sold lot 6, block 4, of Roberts Addition to Wilbur M. Douglass for the agreed price of $8,250. Earnest money of $300 was paid by Douglass. The earnest-money receipt was signed "Roberts & Mariner, by C. E. Mariner", as seller. Mr. and Mrs. Douglass signed as purchaser. This receipt was also placed in a deal envelope and filed in the partnership records. It appears that a new receipt was also substituted for the original, the original discarded, and the deal envelope changed. The new receipt presumably contained the signatures of Douglass and his wife as they appeared upon the original. However, investigation developed the fact that neither Douglass nor his wife signed the substituted receipt. Both, as witnesses, denied their purported signatures. Careful examination of the genuine signatures of Douglass and his wife upon the original receipt issued by defendant leaves no doubt that they had been traced and thereby reproduced upon another document. It is a just inference to be derived from all the evidence that plaintiff placed, or caused to be placed, the alleged signatures of Douglass and his wife upon the substituted earnest-money receipt.

In *Meads v. Stott*, 193 Or 509, 238 P2d 256, 266, we had occasion to notice certain alterations made in the records of the partnership involved in that case. As to this, we said:

> "It is manifest that defendant made the additional entries after difficulties arose between himself and plaintiff in the fall of 1949, and when litigation was imminent. * * * It is evident defendant mistakenly thought that, in this manner, he was bolstering up his case. From this a well-warranted doubt naturally arises regarding the truth of all of defendant's contentions respecting questions of fact in dispute. * * * Where there is a sharp

conflict in the testimony, as there is in this case, 'a straw will show which way the wind blows.' ''

In passing upon the relationship existing between plaintiff and defendant in connection with the housing project, the trial court ruled as follows:

"THE COURT: I have read your brief, Mr. Morris, which was submitted to the Court, I believe yesterday, the contract in the case and as pled as an exhibit in the complaint recites the purpose of the partnership as being that of real estate and insurance business. The question of whether or not the engagement these people interested themselves in the construction and sale of these houses as to whether or not it being within the view of this contract of partnership.

"The evidence in the case shows that there had been some discussion between the partners pertaining to their engagement in this feature of the enterprise. The evidence shows that the discussions that the partners had pertaining to the manner in which they were to operate did not materialize in this respect. The defendant in this case was not able to finance his end of the building program and the plaintiff thereupon went forward with his own financing and did finance and carry forward. That in itself shows failure of the completion of the partnership agreement as to this building project. We have to look into what really happened. What was the conduct of the parties? What they said and did and take the entire evidence with its four corners and determine the matter.

"The Court concludes and determines that the partnership agreement of the real estate and insurance office did not extend to nor cover the activities of these partners in connection with the housing project. That will be the order of the Court. The remaining unfinished part of this case will have to do with the dissolution of the partnership in operating their real estate and insurance office and the accounting incident thereto."

In view of its ruling, the court refused an accounting as to the net profits derived from the sales of the fourteen houses, and allowed an accounting for a five per cent real-estate-sale commission on the sales of twelve of the houses, all of which sales were negotiated by defendant. The court denied an accounting for a commission upon the remaining two houses, the same having been sold by plaintiff in January, 1950. We are of the opinion that the court erred in its conclusions upon the facts and the law. Its error permeates the entire accounting that it effected. We recognize the often-announced rule that, in equity proceedings, this court will give great weight to the findings of the trial court upon disputed questions of fact, but, as we have also often said, such findings are not binding upon us, and the rule itself is one of expediency only. We have a responsibility in every case such as this to make our own independent study of the record and to arrive at our own conclusions respecting it.

For the purposes of this case, it is immaterial whether the house construction and sale project came within the terms of the original partnership agreement and was a part of the real estate business contemplated thereby, or whether it was the subject matter of an independent agreement between the parties. The results must be the same in either case.

However, in view of the fact that the partnership, as a partnership, inaugurated the program, paid all of the initial expenses incident to its launching, called for bids and accepted them, negotiated sales, and the members of the firm devoted most of their time thereto, it might well be concluded that, as a matter of law, the whole project was a part of the real estate business covered by the provisions of the original partnership agreement.

The partnership agreement provides for the conduct of a real estate and insurance business. The partnership was duly licensed under the laws of this state as a "real estate broker". Section 59-102, OCLA, as amended by ch 289, Oregon Laws 1941, in part, defines "real estate broker" as follows:

"(1) The term 'real estate broker' shall mean and include any person who, for another and for compensation or with the intention or in the expectation or upon the promise of receiving or collecting compensation:

"(a) *Sells,* exchanges, *purchases,* rents or leases real estate;

"(b) Offers to sell, exchange, purchase, rent or lease real estate;

"(c) Negotiates, or offers or attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate;

"    *    *    *    *    *    *

"(j) Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate;

"(k) Assists or directs in the negotiation or closing of any transaction calculated or intended to result in the sale, exchange, leasing or rental of real estate." (Italics ours.)

Section 59-301, OCLA, requires a license for real estate brokers, and § 59-302, OCLA, prescribes the qualifications of persons to whom licenses may be issued and "who will actively engage in the real estate business."

By virtue of the provisions of § 59-102, OCLA, as amended, supra, when a broker duly obtains a license, he is authorized to "sell" and to "purchase" real estate, and such purchase and sale constitutes "real estate business".

In *Kirtland v. Corbett,* 144 Tenn 100, 230 SW 27, the court held that a person engaged in buying unim-

proved lots, improving them, and then selling them, is engaged in the "real estate business".

In 68 CJS, Partnership, 518, § 78, it is stated:

"As between partners, the scope of the partnership business is determined by the provisions of the partnership agreement, or by the conduct of the partners and their course of dealing. \* \* \* *The scope of the partnership may be expanded by the mutual consent of the partners, and such change may be evidenced by written or oral agreement,* or by the conduct of the parties. \* \* \* " (Italics ours.)

Under the partnership agreement, each partner agreed to devote all his time and attention to the business of the partnership. The time of a partner is an asset of the partnership. That asset, insofar as plaintiff's time is concerned, was used largely in the promotion of the housing program. As before observed, additional assets of the partnership were used to further the project, including office help and other facilities. Wholly independent of the articles of copartnership, the use of partnership assets by plaintiff in furthering what he now claims to have been his own venture would require him to account to his copartner for the profits derived therefrom, because that operation, as before observed, was within the scope of the partnership business.

Section 79-404, OCLA, in part, provides:

"(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership *or from any use by him of its property.*" (Italics ours.)

In *Chambers v. Johnston,* 180 Ky 73, 201 SW 488, 493, the court said:

"The fact that the transaction was not exactly similar to any deal in stocks in which the partnership had theretofore engaged does not prevent it from being a partnership business, *if it was one in which the partnership might engage within the terms of the partnership contract,* as there are doubtless many other deals in stocks, which are within the partnership business, with different features, however, in which the partnership never did participate. The law governing the rights of partners with relation to each other is well settled. A partner is an agent of his copartners in all partnership transactions, and hence cannot get for himself that which it is his duty to secure for the partnership. If he uses the partnership funds in effecting a private enterprise of his own, he may be required to account to his partners for the profits. If he secures a contract for himself, which it was his duty to secure for the partnership, or purchases property which he should have purchased for the partnership, or engages for himself, without the consent of his copartners, in a business which is similar to the business of the partnership, so as to be in competition with it, he may be required to account to his copartners for the profits. Being the agent of his copartners relative to partnership matters, he must act in perfect good faith toward them, with reference to such matters. * * * " (Italics ours.)

It is unnecessary for us to here point out the duties owed by a partner to his copartners, as that subject has been exhaustively and ably treated in a recent opinion by Mr. Justice WARNER in *Fouchek et al. v. Janicek,* 190 Or 251, 225 P2d 783, reference to which is made. See also *Foley. v. Bouvy,* 158 Or 327, 337, 75 P2d 14; *Dusenberry v. Horning,* 56 Or 210, 216, 106 P 1019; *Neilsen v. Holmes,* 82 Cal App2d 315, 186 P2d 197, 203; 68 CJS, Partnership, 538, § 99; Shumaker, Law of Partnership 2d ed, 154, § 86.

In Shumaker, Law of Partnership, supra, the rule is stated:

"It is clear that every partner must account to the firm for every benefit derived by him, without the consent of his copartners, from any transaction concerning the partnership, or from any use by him of the partnership property, name, or business connection."

As we above observed, ordinarily the accounting between partners on dissolution of the partnership is to be had as of the date of dissolution, and where it is dissolved by decree of a court, as of the date of decree. *Scheckter v. Rubin*, 349 Pa 102, 36 A2d 315; 68 CJS, Partnership, 895, § 384. Detailed requirements for dissolution of a partnership and winding up its affairs are provided in the Uniform Partnership Law of this state: title 79, OCLA.

However, for the reasons heretofore stated, we have concluded that under all the facts and circumstances of this case, the date of dissolution of this partnership should be fixed as of April 24, 1950, and that the accounting between the partners should be up to and including that date, subject, of course, to the provisions of the Uniform Partnership Law respecting the winding up of the affairs of the firm. *Duncan v. Bartle et al.*, 188 Or 451, 216 P2d 1005.

In effecting a final accounting between the parties, the trial court should take into consideration the following:

1. Net profits from the construction and sale of the 14 houses, allowing plaintiff a credit of $1,150 on each lot, as a part of the costs of construction;

2. All profits from the sales of insurance by either partner up to and including April 24, 1950;

3. All commissions from the sales of real estate,

or other deals in real estate, negotiated by or for either partner, up to and including April 24, 1950, excluding the sales of houses in connection with the house construction and sales project. Each partner should be credited with all necessary and reasonable personal expenses incurred in making any such sales, or real estate deals;

4. If subsequent to April 24, 1950, either party has made use of any assets of the partnership to the exclusion of the other, such party should account for the reasonable value of such use.

Upon such accounting, each partner shall be entitled to one-half of the net assets remaining after all partnership indebtedness has been paid.

■ The accounting plaintiff made was upon the basis of the payment of a five per cent real estate commission to the partnership upon the sale of each of the twelve houses that defendant sold. He did not account for receipts from the sales of insurance after the firm's agency had been cancelled by the insurance companies, and plaintiff himself was appointed agent. The conduct of an insurance business was one of the principal objectives of the partnership agreement. Until the firm was dissolved, plaintiff owed a duty to account for all sums he received on account of insurance sales, even though such sales were made by him personally. The accounting plaintiff made showed a sum of money due defendant that apparently is much less than he was actually entitled to under the facts and the law, and was, therefore, erroneous. For the reason that plaintiff made an erroneous accounting to defendant, defendant is entitled to interest at the legal rate of six per cent per annum upon the correct balance due him, if such balance is in excess of the amount shown by plaintiff's

account. *Christian & Craft Grocery Co. v. Hill,* 122 Ala 490, 26 So 149; 40 Am Jur, Partnership, 385, § 364.

Each party must bear one-half of all office expenses up to and including April 24, 1950, when plaintiff locked the defendant out.

The decree is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Defendant is entitled to costs on appeal.